# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

AKAMAI TECHNOLOGIES, INC., and
MASSACHUSETTS INSTITUTE OF
TECHNOLOGY,

                Plaintiffs,

    v.

LIMELIGHT NETWORKS, INC.,

                Defendant.

Civil Action No. 1:06-cv-11109 RWZ

**LIMELIGHT NETWORKS, INC.'S MEMORANDUM
IN SUPPORT OF ITS MOTIONS FOR JUDGMENT
AS A MATTER OF LAW PURSUANT TO FED. R. CIV. P. 50
[LEAVE TO FILE GRANTED APRIL 23, 2008]**

## **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................1

II.   JUDGMENT AS A MATTER OF LAW SHOULD BE ENTERED THAT
      LIMELIGHT DOES NOT INFRINGE THE ASSERTED CLAIMS. ...............3

      A.    Akamai's "Proof" That Limelight Met the "Tagging" Limitation is
            Contrary to This Court's Claim Construction Order and Cannot Stand as
            the Basis for the Jury's Infringement Finding. ......................................3

            1.    Akamai's Evidence of "Tagging" by Limelight Was Directly
                  Contrary to This Court's Claim Construction.................................3

            2.    This Court Previously Construed the Invention as Requiring "the
                  URL Used to Identify the Object in the Absence of a Content
                  Delivery Network."........................................................................6

            3.    This Court's Previous Construction is Consistent with the File
                  Wrapper History and is the Law of the Case. ...............................8

            4.    Dr. Leighton's Testimony Regarding Tagging Should Not Have
                  Been Admitted Because it Violated the Discovery Master's Order
                  and this Court's Overruling of Akamai's Objection to That Order. ..........13

            5.    Akamai Presented No Evidence That Could Support a Finding
                  That Limelight Practices Step 2 of the Asserted Claims. ..........14

      B.    No Substantial Evidence Supports a Finding That Limelight "Replicates"
            or "Distributes" "a Set of Page Objects" Across a Network as Required by
            Each Asserted Claim.............................................................................16

      C.    No Substantial Evidence Supports a Finding That Limelight Specifies an
            Optimal Server "During the Resolving Process" as Required by Each
            Asserted Claim as Interpreted by This Court........................................18

            1.    No Substantial Evidence Supports a Finding That, During the
                  Resolving Process, the Limelight System Specifies an Optimal
                  Server That is "Close to End Users.".........................................19

            2.    No Substantial Evidence Supports a Finding That, During the
                  Resolving Process, the Limelight System Specifies an Optimal
                  Server That is "Tailored to Viewers in [a Particular] Location." ..............20

            3.    No Substantial Evidence Supports a Finding That, During the
                  Resolving Process, the Limelight System Specifies an Optimal
                  Server That is "Most Likely to Already Have a Current Version of
                  the Required File." ....................................................................20

4.      No Substantial Evidence Supports a Finding That, During the
        Resolving Process, the Limelight System Specifies an Optimal
        Server That is "Not Overloaded." ...............................................21

5.      No Substantial Evidence Supports a Finding That, During the
        Resolving Process, the Limelight System Specifies an Optimal
        Server That is "Dependent on Network Conditions." ...............21

6.      "Good" Servers Are Not "Optimal" Servers. ...........................22

D.      No Substantial Evidence Supports a Finding That Limelight Tags "The"
        Embedded Objects of the Page as Required by Claims 19, 20, and 21. ...............23

E.      No Substantial Evidence Supports the Finding that Limelight "Directs or
        Controls" Each Step of the Asserted Claims. ...........................................24

1.      No Substantial Evidence Supports the Finding that Limelight
        "Directs or Controls" Serving the Page. ....................................24

2.      No Substantial Evidence Supports a Finding that Limelight
        "Directs or Controls" Internet Routing. ....................................26

3.      No Substantial Evidence Supports a Finding that Limelight
        "Directs or Controls" the CNAME Method..............................27

F.      No Substantial Evidence Supports a Finding that Limelight "Resolv[es] a
        Request to the Domain as a Function of a Requesting User's Location" as
        Required by Claim 21 or "Resolv[es] the Client Request as a Function of
        the Client Machine Making the Request" as Required by Claim 34. ...................28

G.      No Substantial Evidence Supports a Finding of Limelight "Resolving the
        Client Request as a Function of . . . Current Internet Traffic Conditions" as
        Required by Claim 34. ..........................................................................30

H.      No Substantial Evidence Supports a Finding of Limelight "Returning to
        the Client an IP Address of a Given One of the Content Servers Within the
        Given Region That is Likely to Host the Embedded Object and That is Not
        Overloaded" as Required by Claim 34. ...................................................32

1.      "Not Overloaded" ........................................................................32

2.      "Likely to Host the Embedded Object" .....................................33

III.    EVEN IF FOUND TO BE INFRINGED, JUDGMENT AS A MATTER OF
        LAW SHOULD BE ENTERED THAT THE ASSERTED CLAIMS OF THE
        '703 PATENT ARE INVALID. ......................................................................33

        A.      The Peterson Presentation Anticipates the Asserted Claims — Under
                Akamai's Scope of the Claims.............................................................33

        B.      The Peterson Presentation and the Other Prior Art of Record Renders the
                Asserted Claims Obvious as a Matter of Law — Under Akamai's Scope of
                the Claims. ........................................................................................35

IV.     THE LOST PROFITS AND PRICE EROSION DAMAGES AWARDS ARE
        LEGALLY IMPERMISSIBLE AND NOT SUPPORTED BY SUBSTANTIAL
        EVIDENCE...............................................................................................37

        A.      The Lost Profits Award is Legally Impermissible Due to the Availability
                of Non-infringing Alternatives. ...........................................................37

        B.      The Price Erosion Damages Award is Not Supported by Substantial
                Evidence.............................................................................................40

V.      CONCLUSION..........................................................................................42

# TABLE OF AUTHORITIES

**Page**

**Cases**

BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.
1 F.3d 1214 (Fed. Cir. 1993) ............................................................................ 40

BMC Res., Inc. v. Paymentech, L.P.
498 F.3d 1373 (Fed. Cir. 2007) .......................................................... 24, 25, 27

Chimie v. PPG Indus. Inc.
402 F.3d 1371 (Fed. Cir. 2005) ........................................................................ 8

Crane v. Green & Freedman Baking Co., Inc.
134 F.3d 17 (1st Cir. 1998) ............................................................................... 2

Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.
424 F.3d 1293 (Fed. Cir. 2005) .................................................................. 25, 27

Cytologix Corp. v. Ventana Med. Sys., Inc.
424 F.3d 1168 (Fed. Cir. 2005) ........................................................................ 6

Daiichi Sankyo Co., Ltd. v. Apotex, Inc.
501 F.3d 1254 (Fed. Cir. 2007) ...................................................................... 35

DePuy Spine, Inc. et al. v. Medtronic Sofamor Danek, Inc. et al.
No. 01-10165-EFH, -- F.Supp.2d --, 2008 WL 483585 at *2 (D. Mass. Feb. 25,
2008) ................................................................................................................. 1

Forest Labs., Inc. v. Abbott Labs.
239 F.3d 1305 (Fed. Cir. 2001) ........................................................................ 2

Frazier v. Layne Christensen Co.
239 F.App'x 604 (Fed. Cir. 2007) .................................................................. 36

Fuji Photo Film Co., Ltd. v. Jazz Photo Corp.
249 F. Supp. 2d 434 (D. N.J. 2003) ............................................................... 39

Graham v. John Deere Co.
383 U.S. 1 (1966) ............................................................................................ 35

Grain Processing Corp. v. Am. Maize Prods. Co.
185 F.3d 1341 (Fed. Cir. 1999) ................................................................. 38, 39

Kraft Foods, Inc. v. Int'l Trading Co.
203 F.3d 1362 (Fed. Cir. 2000) ...................................................................... 10

KSR Int'l Co. v. Teleflex, Inc.
     550 U.S. ____, 127 S.Ct. 1727 (2007)...................................................................2, 35, 36

Medtronic Navigation, Inc. v. Brainlab Medizinische ComputerSystems GMBH
     No. 98-cv-01072-RPM, 2008 WL 410413 at *9 (D. Colo. Feb. 12, 2008).......................1

Netword, L.L.C. v. Centraal Corp.
     242 F.3d 1347 (Fed. Cir. 2001)..................................................................................10

Omega Eng'g, Inc. v. Raytek Corp.
     334 F.3d 1314 (Fed. Cir. 2003)..................................................................................11

Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.
     575 F.2d 1152 (6th Cir. 1978)....................................................................................38

Pannu v. Iolab Corp.
     155 F.3d 1344 (Fed. Cir. 1998)....................................................................................2

Perkin-Elmer Corp. v. Computervision Corp.
     732 F.2d 888 (Fed. Cir. 1984)......................................................................................2

PharmaStem Therapeutics, Inc. v. ViaCell, Inc.
     491 F.3d 1342 (Fed. Cir. 2007)..................................................................................36

Regents of Univ. of Cal. v. Dakocytomation Cal., Inc.
     No. 2006-1334, --- F.3d ---, 2008 WL 516705 at *7-8 (Fed. Cir. Feb. 28, 2008)........9, 10

Slimfold Mfg. Co. v. Kinkead Indus., Inc.
     932 F.2d 1453 (Fed. Cir. 1991)..................................................................................38

Summit Tech., Inc. v. Nidek, Co., Ltd.
     (not reported in F. Supp. 2d), 2002 WL 31844693 (D. Mass. 2002)................................2

Watts v. XL Sys., Inc.
     232 F.3d 877 (Fed. Cir. 2000)....................................................................................10

## I.      INTRODUCTION

Patent law is complex and not intuitive to the average juror.  Parties and counsel have an obligation to refrain from seeking to take advantage of those complexities by employing misleading strategies.[1]  In this case, Akamai failed to observe that obligation, but instead relied upon new terms (e.g., "CDN Virtual Hostname" and "Intelligent DNS") not appearing in the patent, the claims, this Court's claim construction, or discovery, and used them vaguely and inconsistently to assert that use of Limelight's CDN system infringed the '703 Patent.

Akamai's artifice was embellished with arguments that equated end results with the required steps of the claims at issue, false suggestions of copying by Limelight, and assertions that the alleged invention changes the basic way things are done and makes the World Wide Web feasible (Trial Tr., 47:17-23, February 28, 2008, Session 1)[2] even though claims of the '703 Patent purporting to cover the invention have been found to be invalid.

The jury's verdict of infringement is not supported by substantial evidence; indeed, no evidence of infringement exists for several steps of the asserted claims.  And the infringement evidence was premised on assertions directly contrary to this Court's claim construction holdings as to the express scope of the invention disclosed and claimed in the patents-in-suit.

Limelight acknowledges any reluctance this Court may have to setting aside a jury verdict following a 13 day trial.  But that verdict, based on assertions inconsistent with this Court's prior rulings, and on insubstantial evidence, should not be allowed to stand.

---

[1]   DePuy Spine, Inc. et al. v. Medtronic Sofamor Danek, Inc. et al., No. 01-10165-EFH, -- F.Supp.2d --, 2008 WL 483585 at *2 (D. Mass. Feb. 25, 2008) (Memorandum and Order) (citing Medtronic Navigation, Inc. v. Brainlab Medizinische ComputerSystems GMBH, No. 98-cv-01072-RPM, 2008 WL 410413 at *9 (D. Colo. Feb. 12, 2008), Order for Award of Attorneys Fees and Costs).

[2]   Attached is a Transcript Appendix, which is a chronological compilation of all transcript pages cited in this Memorandum.  We understand that for certain trial days the pagination of the transcripts delivered electronically by the reporters differs from the later hard copy pagination.  All citations to and copies of the trial transcript in this Memorandum are to the electronic transcripts.

Judgment as a matter of law is proper where there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.  Fed. R. Civ. P. 50.  Where, as here, "the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied [by] the jury's verdict cannot in law be supported by those findings" a motion for judgment as a matter of law must be granted.  Pannu v. Iolab Corp., 155 F.3d 1344, 1348 (Fed. Cir. 1998) (quoting Perkin-Elmer Corp. v. Computervision Corp., 732 F.2d 888, 893 (Fed. Cir. 1984); accord Crane v. Green & Freedman Baking Co. Inc., 134 F.3d 17, 21 (1st Cir. 1998).  Although the Court must consider all the evidence in a light most favorable to Akamai, and draw all reasonable inferences in its favor (Forest Labs., Inc. v. Abbott Labs., 239 F.3d 1305, 1309 (Fed. Cir. 2001), where, as here, the record as a whole does not contain a legally sufficient evidentiary basis for a reasonable jury to have found for Akamai based on this Court's claim construction, Limelight is entitled to judgment of non-infringement as a matter of law.  See Summit Tech., Inc. v. Nidek, Co., Ltd. (not reported in F. Supp. 2d), 2002 WL 31844693 (D. Mass. 2002) and cases cited therein.

Therefore, because the jury's verdict is based on assertions inconsistent with this Court's rulings, and also lacks support by substantial evidence, Limelight respectfully requests that the Court grant its Motions for Judgment as a Matter of Law ("JMOL") under Rule 50 that Limelight does not infringe the '703 Patent, or that (if found to be infringed) the asserted claims are invalid.[3]

---

[3]   See Docket #s 271 (Motion for Judgment as a Matter of Law) and 274 (Supplemental Motion for Judgment as a Matter of Law); Trial Tr., 167:4-10, February 20, 2008; Trial Tr., 172:8-12, February 27, 2008.

Limelight has also filed, concurrently with this Motion, a Motion for New Trial, and a Motion seeking that this Court find the asserted claims of the '703 Patent invalid as obvious over the prior art, as a matter of law, pursuant to the standard established in KSR Int'l Co. v. Teleflex, Inc., 550 U.S. ____, 127 S.Ct. 1727 (2007).

## II.     JUDGMENT AS A MATTER OF LAW SHOULD BE ENTERED THAT LIMELIGHT DOES NOT INFRINGE THE ASSERTED CLAIMS.

### A.     Akamai's "Proof" That Limelight Met the "Tagging" Limitation is Contrary to This Court's Claim Construction Order and Cannot Stand as the Basis for the Jury's Infringement Finding.

The only evidence presented that Limelight meets the "tagging" step of each asserted claim is that Limelight is liable for "tagging [ . . . ] the embedded objects of the page" by causing an alphanumeric string comprising a Limelight hostname — what Akamai newly dubbed for this trial a "CDN virtual hostname" — to be substituted for the original hostname in the URL for the object, either directly or via CNAMEing.  This does not, and cannot, establish infringement of the asserted claims as previously construed by this Court, because the URL used to identify the object in the absence of a content delivery network is not included.  Because Akamai's purported proof of infringement was contrary to this Court's holdings, and received over Limelight's repeated objections, it is unable to support the infringement finding by the jury.  And because no other evidence was presented that Limelight meets the "tagging" steps of the asserted claims, JMOL must be granted in Limelight's favor.

### 1.     Akamai's Evidence of "Tagging" by Limelight Was Directly Contrary to This Court's Claim Construction.

Prior to the Court's claim construction in this case, the parties stipulated that the term "tagging" means "providing a 'pointer' or 'hook' so that the object resolves to a domain other than the content provider domain."  (See Stipulated Order Establishing the Constructions for Certain Claim Terms as Agreed Upon by the Parties (Docket # 74 ("Stipulation").)[4]  Thereafter,

---

[4]   The term "tagging" does not appear in the specification.  The term "tagged" does appear ("If the redirect is to a virtual server, then it must be tagged to prevent further redirections from taking place" ('703 Patent (PX 1), col.12 ll.47-49)) in the context of an additional safeguard that involves redirecting a request for an object to a close low level DNS server after examining the IP address of the user before responding to the request for the file to address the rare case when the user's DNS server is far away from the user.  (See '703 Patent, col.12 ll.40-49).  This use of the term "tagged" does not refer to "tagging" an embedded object, but rather of a redirection of a user request to prevent further redirection.

this Court made findings about the scope of "the invention" disclosed in the then three patents-in-suit, all of which have the identical specification and disclosure.  (See Docket # 92, Order Regarding Claim Construction ("Claim Construction Order").)  Limelight also had obtained an order from the Discovery Master preventing Dr. Leighton from giving testimony about modified URLs not discussed in the patent.  (See Docket # 111 and Order Of Special Discovery Master dated December 18, 2007 ("Discovery Master's Order").)

Nevertheless, it became apparent during trial that Akamai was asserting a meaning for "providing a 'pointer' or 'hook' so that the object resolves to a domain other than the content provider domain" that was inconsistent not only with (1) the Discovery Master's Order (which this Court affirmed) but also, (2) this Court's prior holding that "the invention" disclosed in the patents-in-suit was limited to "associating a particular object of a content provider with an alphanumeric string consisting of a virtual server hostname prepended onto the URL for the object."  (See Claim Construction Order, Part III, A.1 at 4-6.)  Specifically, Akamai coined a new term — CDN virtual hostname — and said that use of such a CDN virtual hostname meets the requirements of the "tagging" step of each asserted claim, even though that term does not appear in the patent, the claims, this Court's claim constructions, or discovery.

The term "CDN virtual hostname" was first presented at trial — to the jury, this Court and Limelight — during the direct testimony of Dr. Leighton, over repeated objections of Limelight, and despite this Court's ruling that:

> THE COURT:  I think Mr. Leighton is entitled to describe the invention.  He is not entitled to do it in a way that is not in the patent.

(Trial Tr., 51:4-6, February 12, 2008, Session 2.)  Akamai's counsel elicited Dr. Leighton's testimony coining the term CDN virtual hostname and, despite this Court's admonition, defining it in a way that is "not in the patent."  Limelight's counsel again objected, but Akamai's counsel

represented to the Court that the example being used "is taken directly from the patent."  (Trial Tr., 52:15-17, February 12, 2008, Session 2.)  The Court overruled Limelight's objection and allowed Dr. Leighton to testify that the invention disclosed in the patent covered "replacing the old hostname with something that is not a new hostname" but instead "a virtual hostname from the CDN" and not retaining the original URL.  (Trial Tr., 53:25 - 54:2, February 12, 2008, Session 2, together with Akamai Demonstrative Leighton 32 and 34.1 (attached as Exs. 1 and 2).)

Akamai's representations to the Court that the example used "is taken directly from the patent" and "the example that I just pointed out that is smack in the middle of the patent" (Trial Tr., 53:14-15, February 12, 2008, Session 2) were, at best, only half true.  Although the alphanumeric string used in the example ("a123.akamai.net") did come from the patent, nowhere does the patent disclose how Dr. Leighton testified that string was used — namely replacing the old hostname with a CDN virtual hostname without retaining the original hostname in the URL.[5]

What Akamai presented through Dr. Leighton, and later Dr. Crovella, as its sole evidence of "tagging" by Limelight is nowhere disclosed in the patent, and is directly contrary to the express, prior holding of this Court on the scope of "the invention" that is the subject of the patent.

---

[5]   Later in the trial, Akamai cited to the portion of the specification that states "[i]f only one DNS level is used, a representative URL could be 'a1234.akamai.com" ('703 Patent, col.9 ll.53-54) to argue that the invention somehow covers more than what the Court has stated in its Order.  The "a1234.akamai.com" referenced by Akamai is undeniably just a hostname (not a URL).  (See '703 Patent, col.9 ll.24-25, referring to "ghost1467.ghosting.akamai.com" as a hostname; col.7 ll.2-3, calling "a1234.g.akaimaitech.net" a hostname.)  The "a1234.akamai.com" hostname has no effect on how the patent describes changing the complete URL, which is by adding the virtual server hostname to the original URL for the object that includes the original content provider hostname.  Thus, the reference to "a1234.akamai.com" in the patent does not change this Court's finding that "the invention" covers only one way of modifying an object's URL.  (See Section II.A.2 infra.)

2.    **This Court Previously Construed the Invention as Requiring "the URL Used to Identify the Object in the Absence of a Content Delivery Network."**

No new claim construction or analysis is necessary or appropriate to deal with what Akamai did at trial.  This Court already ruled on what "the invention" of the patent covers.  The parties were obligated by law and ethics to abide by this Court's decision.  To the extent nay party disagreed, its recourse was to take an appeal to the Federal Circuit rather than misleadingly describe the invention to the Court and the jury.  See Cytologix Corp. v. Ventana Med. Sys., Inc., 424 F.3d 1168, 1172 (Fed. Cir. 2005) (stating that "[t]he risk of confusing the jury is high when experts opine on claim construction before the jury even when . . . the district court makes it clear to the jury that the district court's claim constructions control.")

This Court previously evaluated the patents' specification to construe the meaning of "a given object of a participating content provider is associated with an alphanumeric string" in Claim 1 of the '645 patent.  (See Claim Construction Order , Part III, A.1. at 4-6.)  As this Court noted in its Claim Construction Order, the three patents then at issue (including the '703 Patent) share a common specification; only the claims differ between them, such that the invention as disclosed is the same across the three patents.  (Id. at 1.)  As also noted in this Court's Claim Construction Order, "[w]hile limitations from the specification should not be read into the claims, a patent is a 'fully integrated written document'" and the "claims must be read in view of the specification, of which they are a part."  (Id. at 2.)

It was in this context that this Court held in its Claim Construction Order:

"The '645 Patent specification [which is the same as the '703 Patent specification] describes as the present invention a single embodiment in which the Uniform Resource Locator ("URL") used to retrieve an embedded object from the content provider's server(s) in the absence of a content delivery network is modified by prepending it with a virtual server hostname:

6

> According to the present invention, a given Web page (comprising a base HTML document and a set of embedded objects) is served in a distributed manner. . . . To serve the page contents in this manner, <u>the URL associated with an embedded object is modified</u>. As is well known, each embedded object that may be served in a page has its own URL. . . . According to the invention, the <u>embedded object URL</u> is first modified, preferably in an off-line process, to condition the URL to be served by the global hosting servers[] . . . . Thus, <u>according to the present invention</u>, a virtual server hostname is prepended <u>into the URL for a given embedded object</u> . . . ."

('645 Patent, col.6 l.35 - col.7 l.40 (emphasis added) [corresponding to '703 Patent, col.6 l.21 - col.7 l.26].)

(Claim Construction Order at 4-5; emphasis in original.)  The Court further described "the invention" as follows:

> The specification then continues on to describe "<u>the inventive global framework</u>" in the context of a specific example. (<u>Id.</u> col.7 ll.50-53 (emphasis added).)  At step 5 of the example, a copy of the object is retrieved from a content delivery provider ("ghost") server. The specification goes on to explain:

>> Step 6: If, however, no copy of the data on the ghost exists, a copy is retrieved from the original server or another ghost server.  Note that <u>the ghost knows who the original server was because the name was encoded into the URL that was passed to the ghost from the browser</u>.  (<u>Id</u>, col.12 ll.54-58 (emphasis added) [corresponding to '703 Patent, col.12 ll.35-37].)

> Here, the specification describes <u>the invention</u> as associating a particular object of a content provider with an alphanumeric string consisting of **a virtual server hostname prepended onto the URL for the object.**  The URL of the object is necessary to the inventive global framework in order to retrieve the object from the content provider's server if no copy exists on a ghost server. **The specification discloses no other way that an object is associated with an alphanumeric string, nor is there any suggestion or teaching that an association which did not include the URL for the embedded object could be used in an embodiment of the invention**."

(Claim Construction Order at 5-6; bold emphasis added, underline in original.)

Thus, the specification expressly limits **"the invention"** to the use of an alphanumeric string consisting of a virtual server hostname prepended onto the URL for the object as the only

way for "providing a 'pointer' or 'hook' so that the object resolves to a domain other than the content provider domain."  This Court's Claim Construction Order is equally applicable to the '703 Patent, is the law of the case, and governs the parties' proofs.

### 3.   This Court's Previous Construction is Consistent with the File Wrapper History and is the Law of the Case.

This Court's Claim Construction Order is consistent with, and confirmed by, the '703 Patent file history.  The "tagging" limitation was not in the original '703 Patent application as filed.  Rather, the first reference to "tagging"[6] was in new application Claims 42 and 47 (issued Claims 17 and 19), added by Supplemental Preliminary Amendment filed January 5, 2000.  (See DX 444 (File Wrapper History for the '703 Patent) at AKL217427-429.)  The only discussion of the "tagging" step was in the Amendment To First Office Action ("Amendment"), filed March 14, 2000, in which new application Claim 53 (issued Claim 34) was added and application Claims 42 and 47 (issued Claims 17 and 19) were amended.  (Id. at AKL217447-466.)  In that Amendment, the inventors made an "unequivocal disavowal"[7] of any broader interpretation of the claimed invention:

> As was described during the Interview, this functionality [referring to the present invention[8]] is achieved by modifying the embedded object URL that is normally sent with the base HTML of the web page when that page is served from the content provider server.  In particular, the embedded object URL is modified (e.g. at the content provider server) to **prepend given data to the domain name and path normally used to retrieve the embedded object**.  (DX 444 at AKL217457; emphasis added.)

---

[6]  See footnote 3, supra.

[7]  Chimie v. PPG Indus. Inc, 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("where the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender") (citation omitted).

[8]  "As discussed during the Interview, the present invention generally describes an Internet content delivery service and method wherein a given web page has component elements that are served to a requesting client browser from two different sources; namely, the base HTML of the web page is served from the content provider server, while at least one embedded object required by the page is served from a selected one of a set of content servers, which are typically managed apart from the content provider domain." (Id. at AKL217457.)

The inventors further stated:

> At the current time, this application is on Accelerated Examination.  Thus, to simplify prosecution of this case, the undersigned (as promised) has gone back through the pending claims and cancelled certain claims and modified others where appropriate **so that __all independent claims__ now emphasize the above-described aspects of the present invention**.  (DX 444 at AKL217458; emphasis added.)

Thus, the Applicants described the invention (as claimed in each independent claim) as requiring use of the object's URL normally used to retrieve the object.  <u>Regents of Univ. of Cal. v. Dakocytomation Cal., Inc.</u>, No. 2006-1334, --- F.3d ---, 2008 WL 516705 at *7-8 (Fed. Cir. Feb. 28, 2008) (limiting claims to description of invention in file history where applicant stated "newly added claims are directed to this embodiment of the invention").  Issued Claim 19 (application Claim 47) and newly presented Claim 34 (application Claim 53) were pending "independent claims" at the time of the Applicants' statements to the PTO that all independent claims were so limited.

Akamai has argued (Docket # 284 (Plaintiffs' Objection to Limelight's Proposed Jury Instruction)) that Claims 19 and 34 are not limited by this Court's holding about the scope of "the invention" or by the file history.  Akamai's arguments are inapposite, and cannot broaden the claims of the '703 Patent beyond "the invention" as disclosed.

Akamai argued that the term "alphanumeric string" does not appear in the asserted claims, so this Court's holding about that term lacks any nexus to the words of the claim. (Docket # 284 at 4-5, 6-7.)  But this ignores the fact that this Court's holding was not limited to the term "alphanumeric string" in Claim 1 of the '645 patent, but related to the inventors' description of "the invention."  (Claim Construction Order at 5-6.)  Akamai also argued that "[s]pecifications teach.  Claims claim."  (Docket # 284 at 4.)  But this Court properly dismissed that argument when making its prior ruling that the claims are limited by what the inventors describe as "the invention."  (Claim Construction Order at 4-6; <u>see</u> also <u>supra</u>, page 7.)

Akamai further argued that following this Court's prior holding would "effectively eviscerate the Court's 'tagging' construction" (Docket # 284 at 4), but that argument is specious. This Court's "tagging" construction, like each of its constructions, was (as it must be) in the context of what the patent describes as "the invention."  Neither the claims, nor their constructions, can extend beyond what the patent defines as "the invention."  <u>Netword, L.L.C. v. Centraal Corp.</u>, 242 F.3d 1347, 1352 (Fed. Cir. 2001) (stating that "[a]lthough the specification need not present every embodiment or permutation of the invention and the claims are not limited to the preferred embodiment of the invention, … **neither do the claims enlarge what is patented beyond what the inventor described as the invention**") (emphasis added.)

Akamai's argument that limiting the meaning of "tagging" as construed would violate the doctrine of claim differentiation in view of the language of Claims 14-17 (Docket # 284 at 4), is similarly off the mark.  Claims 19 and 34 have other limitations that distinguish their scope from Claims 14-17 (e.g., the "replicating" and "distributing" steps).  <u>Kraft Foods, Inc. v. Int'l Trading Co.</u>, 203 F.3d 1362, 1368 (Fed. Cir. 2000) (stating that although "claims are presumed to differ in scope does not mean that every limitation must be distinguished from its counterpart in another claim, but only that at least one limitation must differ"); <u>Regents of Univ. of Cal.</u>, 2008 WL 516705 at *9 (rejecting applicant's claim differentiation argument due to statements in the file history limiting the scope of the claims).  Thus, nothing prevented the inventors from coining the term "tagging" to refer to the prepending requirements of "the invention."  And because the term "tagging" was added to the application **after** the application was filed, it cannot be broader than "the invention" as described by the inventors in the original application.  <u>Watts v. XL Sys., Inc.</u>, 232 F.3d 877, 882-84 (Fed. Cir. 2000) (holding that a later-added claim was limited to the invention as described in the specification and prosecution history).

Akamai's attempts to distinguish the inventors' express file history disclaimer (Docket # 284 at 7-9) must also be rejected.  Akamai's argument that the quoted language does not mean what it says cannot change what the inventors said in order to obtain allowance of the claims. And it makes no difference whether or not this Court construes the inventors' statements to refer to all the independent claims then pending (including previously pending Claim 47 (issued Claim 19) and newly added but also pending Claim 53 (issued Claim 34)).  Virtually the same "tagging" step language from issued Claim 19 (which indisputably was "pending" at the time of the statements) is also included in issued Claim 34 (only "at least some of" is added in Claim 34), and the same meaning must be accorded to these same terms in different claims.  <u>Omega Eng'g, Inc. v. Raytek Corp.</u>, 334 F.3d 1314, 1334 (Fed. Cir. 2003) ("we presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning.").

Akamai's argument that the proper construction of "tagging" would be a non-sequitur (Docket # 284 at 9, arguing that "[t]agging has nothing to do with retrieving an object …") is wrong for several reasons.  Each of the asserted claims requires either replicating or distributing objects across the network, which under Akamai's interpretation requires obtaining them from the content provider server and caching them in the content delivery network servers. Alternatively, if (as the plain language of these steps requires, and as Limelight asserts) these steps require replicating or distributing a set of embedded objects across the network as the first step, then the original hostname and path is required to identify which of such objects are to be served or returned to the user in response to the user's request.

And Akamai's assertion that "the CDN virtual hostname is the only portion of the URL that the DNS sees when it performs the resolution function" (Docket # 284 at 9) completely

misses the point.  Each asserted claim requires the step of either "serving at least one embedded

object" or "returning to the client an IP address of a given one of the content servers . . . likely to

host the embedded object," both of which require the use of the rest of the URL.  Further, when

"tagging" an object with a URL, the URL will necessarily include the name of the object — not

just the "CDN virtual hostname."  Akamai's argument again ignores the simple reality that the

scope of the claims cannot be broader than "the invention" disclosed in the patent.

Thus, in view of the parties' Stipulation, this Court's prior Claim Construction Order, and

the inventors' "unequivocal disavowal" in the file history, the language of the second step of

each of the asserted claims, with construed and stipulated substitutions, reads:

> "providing a 'pointer' or 'hook' that includes an alphanumeric
> string consisting of a virtual server hostname prepended onto the
> URL used to identify the object in the absence of a content
> delivery network so that the object resolves to a domain other than
> the content provider domain."

This is the law of the case, and all parties have relied upon it.  Akamai sought entry of

Judgment Pursuant to Rule 54(b) to allow it to challenge this Court's construction, precisely

because of the rulings Limelight relies upon here, and their affect on the claims of the other

patents-in-suit.  (See Docket # 103.)  All three patents-in-suit, and twenty-nine asserted claims

from them, remained at issue until two weeks before trial.  Indeed, Akamai did not drop the '645

patent from the issues for trial until after Limelight had moved for summary judgment against

Akamai based on the Claim Construction Order now at issue.  (See Docket #'s 112 and 180.)

Thus, Akamai knew the scope and impact of this Court's Claim Construction Order, and

of Limelight's reliance upon it.  Coining the new term "CDN virtual hostname," and using it

rather than the full URL for an embedded object does not negate this Court's rulings.  Akamai

thwarted Limelight's efforts to alert the Court to its improper actions, by representing

inaccurately that Dr. Leighton was simply testifying as a fact witness and was merely using an

example taken directly from "smack in the middle of the patent." (Trial Tr., 53:14-15, February 12, 2008, Session 2.) Akamai used this artifice to persuade the jury that Limelight infringed the asserted claims — contrary to this Court's Claim Construction Order. The resulting verdict cannot be allowed to stand.

> **4.    Dr. Leighton's Testimony Regarding Tagging Should Not Have Been Admitted Because it Violated the Discovery Master's Order and this Court's Overruling of Akamai's Objection to That Order.**

On December 18, 2007, the Discovery Master ruled that Dr. Leighton could not give expert testimony unless Akamai complied with Fed. R. Civ. P. 26(a)(2). (See, Discovery Master's Order.) A specific area of opinion covered by the Discovery Master's Order included Dr. Leighton's opinion about a URL (after modification by the Akamai system) that he contended was an embodiment of "tagging" as claimed in the patents. (Discovery Master's Order at 4.) Indeed, the Discovery Master specifically ruled that it was <u>not</u> fact testimony for Dr. Leighton to testify that http://a05678.akamaitech.net/banner.gif was a modified URL under the patent. (See Docket # 111 at 4, ¶ 2.)

This Court upheld that ruling, and ruled that Dr. Leighton could give fact testimony only. (See February 8, 2008 Electronic Endorsement re Docket # 119, and Trial Tr., 5:11-19, February 12, 2008, Session 2.) Nevertheless, contrary to the Discovery Master's Order, and this Court's overruling of Akamai's Objection to the Discovery Master's Order, Akamai elicited testimony from Dr. Leighton that did precisely what the Discovery Master and this Court held that it could not.

Despite those rulings, Akamai prepared slides showing an imaginary website (www.mydog.com) that followed the same format previously found to be improper opinion from Dr. Leighton. (See Ex. 2 (Akamai Demonstrative Leighton 34.1).) Limelight objected to these slides before Dr. Leighton's testimony (see Ex. 3 (Feb. 11, 2008 email from A. Buchner to P.

Wilkins)), which Akamai ignored.  Limelight also objected during Dr. Leighton's testimony, as

noted supra (Trial Tr., 52:6-13, February 12, 2008, Session 2), but Akamai prevailed through

half-truths in having this Court overrule Limelight's objections, based on the same argument that

the Discovery Master and this Court had previously rejected.

The form of the URL referenced in Dr. Leighton's report and during his direct

examination regarding the demonstrative "www.mydog.com" website appears nowhere in the

patents.  This is why the Discovery Master concluded it was not fact testimony.  Indeed, during

cross-examination, Dr. Leighton himself admitted that the only way the patent showed how to

"tag" was to change URLs but preserve the content provider hostname.  (Trial Tr., 46:15-21,

February 13, 2008.)  It was improper for Akamai to cause Dr. Leighton to testify as he did,

contrary to numerous rulings and orders precluding that very testimony.

**5.    Akamai Presented No Evidence That Could Support a Finding That Limelight Practices Step 2 of the Asserted Claims.**

Akamai did not, and could not, present evidence that either Limelight or its customers,

either directly or via CNAMEing, meet the "tagging" limitation of each asserted claim as

properly construed by this Court's Claim Construction Order, to wit:

> "providing a 'pointer' or 'hook' that includes an alphanumeric
> string consisting of a virtual server hostname prepended onto the
> URL used to identify the object in the absence of a content
> delivery network so that the object resolves to a domain other than
> the content provider domain."

Instead, Akamai presented evidence only that Limelight supposedly infringes the asserted

claims based on the supposed use in Limelight's system of a CDN virtual hostname  or an

alphanumeric string (i.e., the customer short name, server type, and Limelight domain name) as

the purportedly infringing "'pointer' or 'hook.'"  For example, Akamai's expert (Dr. Crovella)

stated:

14

- So, if we go forward, we'll see how the tagging process operates.  Remember that tagging process is changing the hostname to a CDN virtual hostname.[9]  (Trial Tr., 42:1-3, February 14, 2008.)

. . .

In the language that -- the construction of tagging, we have the phrase, "providing pointer or hook."  So that's why you see, "pointer or hook" down here.  It means something that causes the URL to resolve to a domain other than a content provider domain.  (Trial Tr., 42:9-13, February 14, 2008.)

. . .

Yes, that's exactly what happens in the Limelight method.  As a matter of fact, here you have an example of what might happen.  The DreamWorks.com hostname would be modified to something like DreamWorks.xx.lmwd.net (*sic*).  (Trial Tr., 42:16-19, February 14, 2008.)

- So, what I am showing is that the -- the containing page has had its URL, that embedded URL -- it's been modified at Limelight's instruction so as to include, now, a CDN virtual hostname instead of the hostname that was there before, and that's -- that's the meaning of this phrase "tagging," tagging the embedded object so that they resolve to a domain other than the content provider domain.  So that they resolve to the CDN domain, what is Limelight's domain.  (Trial Tr., 44:18-45:1, February 14, 2008.)

Dr. Crovella's testimony — which relied on Dr. Leighton's improper testimony for support (Trial Tr., 112:6 - 114:14, February 13, 2008) and on which Akamai relies for its infringement proof — is directly contrary to this Court's Claim Construction Order, as noted above, and cannot be the proper basis for proving infringement.

---

[9]   Akamai's use of the term "CDN virtual hostname" was inconsistent and misleading.  Dr. Leighton testified that a "CDN virtual hostname" is a hostname such as "a123.akamai.net."  (Trial Tr., 51:20 - 54:2, 64:1, 77:23-24, February 12, 2008, Session 2.)  Dr. Crovella  testified that the CDN virtual hostname is a hostname; (Trial Tr., 123:22-25, February 13, 2008; Trial Tr., 130:24 - 131:3, February 14, 2008) and  that the "tag" is the CDN virtual hostname.  (Trial Tr., 59:19-22, February 14, 2008.)  But he also testified that "the tag is a URL that contains one of these virtual hostnames or a URL that resolves to the content delivery network servers."  (Trial Tr., 57:4-6, February 14, 2008.)  Akamai's expert related to invalidity, Dr. Jeffay, testified that the prior art did not disclose "CDN virtual hostnames," but just "vanilla hostnames."  (Trial Tr., 36:17-25, 67:4-8, February 27, 2008.)  Dr. Jeffay further criticized the prior art hostnames because "there's no encoded information" or "processing of that information by the DNS."  (Trial Tr., 36:17-25, February 27, 2008.)  Dr. Jeffay further testified that claim 1 of the '703 Patent (invalid due to the prior art) did not disclose a "CDN virtual hostname," but just a "hostname."  (Trial Tr., 77:3-5, February 27, 2008.)  And in closing argument, Akamai's counsel argued that a CDN virtual hostname is "simply shorthand for what the Judge has defined as an optimal server …"  (Trial Tr., 83:5-11, February 28, 2008, Session 1).

**B.     No Substantial Evidence Supports a Finding That Limelight "Replicates" or "Distributes" "a Set of Page Objects" Across a Network as Required by Each Asserted Claim.**

Claims 19-21 of the '703 Patent require "replicating a set of page objects across a wide area network of content servers …"  Claim 34 requires "distributing a set of page objects across a network of content servers …"  Akamai did not present substantial evidence that Limelight either replicates or distributes "a set of page objects across a [wide area] network."

Akamai expert Dr. Crovella defined "replicate" as "to cause a number of additional copies to exist."  (Trial Tr., 27:25-28:2, February 15, 2008.)  But Dr. Crovella admitted that Limelight's system does just the opposite — that for each request, replication only occurs one object at a time, and to only a single content server.  (Trial Tr., 33:4-16, February 15, 2008.)  Dr. Crovella further admitted that Limelight's system will not take content from the origin server and populate other content servers in the Limelight network.  (Trial Tr., 33:17-22, February 15, 2008.)  Dr. Crovella acknowledged that this reasoning also applies to the "distributing a set of page objects across a network" limitation of Claim 34.  (Trial Tr., 34:2-12, 35:1-13, February 15, 2008.)

Mr. Gordon's testimony confirms that Limelight does not replicate or distribute a set of page objects across a network:

> **Q:** Does Limelight ever send a copy of a particular piece of content to a group of content servers in response to a single request for that content?
>
> **A:** No, we do not.  The only content server that gets the object is the content server that needs the object to return it to a user.
> (Trial Tr., 67:24 - 68:4, February 21, 2008.)

Simply put, no evidence exists that Limelight either replicates or distributes "a set of page objects" across a network as required by the asserted claims.  In fact, the evidence presented

16

indicates the opposite — Limelight replicates or distributes one object at a time to only one server at a time.

Akamai's contention, that objects become cached across several servers in the Limelight network over time, and therefore become "replicated" or "distributed" across the network over time, is irrelevant under the claim language at issue. The asserted claims affirmatively require "replicating" or "distributing" "**a set** of page objects" across a network — not that at some point a page object will have been replicated or distributed across such a network. Had the named inventors intended that the replicating or distributing step could be the result of repetitive past acts of individual object replication or distribution, the asserted claims could have been drafted to provide that individual page objects "were" or "have been" "replicated" or "distributed" before a request for the associated page. Because the inventors chose active, present tense verbs — "replicating" and "distributing" —  operating on "a set" of page objects simultaneously, and are bound by the plain and ordinary meaning of the words they chose.

Similarly, Akamai's contention that page objects are cached on Limelight servers over time, and thus "a set of page objects" ends up eventually having been "replicated" or "distributed" is also contrary to the plain language of the claims. Replicating or distributing one page object at a time (as is done in Limelight's system), is not replicating or distributing "**a set** of page objects" as required by the express language of the asserted claims. The plain and ordinary meaning of the language of the asserted claims requires that the page objects be replicated or distributed as "a set." Limelight does not do that, and Akamai presented no evidence that it does, much less evidence that it was done for all of the acts for which Akamai was awarded damages.

Finally, the "replicating" and "distributing" steps are the **first** steps of each of the asserted claims. Although Akamai contends that these steps need not be done first, the plain and

ordinary meanings of the words of these claims compels the opposite conclusion.  The structure and syntax of the "replicating" and "distributing" steps supports only one conclusion: that they be performed first.  There is no other logical time in the sequence of the asserted claims when it would make sense to perform them.  And Akamai cannot dispute that the "serving" step of Claims 19-21 and the "returning" step of Claim 34 cannot be performed unless the requested content exists on the content servers of the network (i.e., the CDN).  Further, under this Court's construction of the "tagging" step of each asserted claim, content must exist on the CDN's content servers in order to determine whether any of them are "optimal" servers.  (See infra, Section II.C.)

> **C.     No Substantial Evidence Supports a Finding That Limelight Specifies an Optimal Server "During the Resolving Process" as Required by Each Asserted Claim as Interpreted by This Court.**

As part of the Stipulation, the parties agreed that the term "to resolve to a domain other than the content provider domain" means "to specify a particular group of computers that does not include the content provider from which an optimal server is to be selected."  (Docket # 74.)  Later, this Court construed the term "optimal" and presented five criteria ("the criteria") for determining whether the "optimal server" requirement was met.  (Docket # 246 (Order Construing Stipulated Term) (the "Feb. 8, 2008 Order").)[10]  In that Order, this Court determined that the critical time for the selection (i.e., when the criteria must be considered) is "during the

---

[10]   Limelight respectfully believes that the Court's Feb. 8, 2008 Order was in error, and reserves its objections to that Order based on its previous arguments, including briefing on Limelight's Motion for Summary Judgment of Noninfringement.  (Docket #'s 112 - 113.)  However, Limelight accepts this Court's Feb. 8, 2008 Order as the law of the case for purposes of this motion, and asserts that even under that Order, Akamai failed to prove infringement.

resolving process."[11]  (Id. at 2) (stating that the relevant issue "was that the '598 patent did not disclose the selection of the content server 'during the resolving process.'")

In Akamai's October 7, 2004 Motion for Judgment as a Matter of Law in the Digital Island case (i.e., the pleading discussed in this Court's Feb. 8, 2008 Order[12]), Akamai distinguished the invalidating prior art by arguing that "the '598 patent does not 'disclose or fairly suggest' selection of a best server 'during the resolving process' as required by each of these claims."  (DX 47 at 6, ¶ 11; emphasis added.)  Because Akamai admitted that the claims at issue require selection of what the parties stipulated was an "optimal" server, as relied upon by this Court in its  Feb. 8, 2008 Order, Akamai cannot now be heard to assert that that selection can be made at a different time.

Akamai failed to present any evidence that any of the required criteria were considered by or at the Limelight DNS server "during the resolving process."  Instead, for each of the criteria, the consideration occurred at some time **other** than "during the resolving process," or not at all.

> **1.      No Substantial Evidence Supports a Finding That, During the Resolving Process, the Limelight System Specifies an Optimal Server That is "Close to End Users."**

Akamai contended that Limelight's use of Anycast caused requests from users to arrive at a "close" name server in a PoP, and because the content server specified by the Limelight DNS server is usually in the same PoP, then the content server is necessarily "close" to the end user. (Trial Tr., 68:20 - 69:16, February 14, 2008.)  But it is undisputed that what causes requests to

---

[11]   It is undisputed that "resolving" means "translat[ing] into an IP address."  (See Claim Construction Order at 17); (Trial Tr., 45:21 - 46:3, 57:14-18, February 12, 2008, Session 2; Trial Tr., 63:8-10, 106:2-6, February 14, 2008.)  The "resolving" step is performed by the DNS server, which translates the hostname into an IP address.

[12]   Akamai's Motion for Judgment as a Matter of Law included Claim 22, which depends from Claims 19-21. Thus, the Motion necessarily includes Claims 19-21.  That motion successfully resuscitated the validity of Claims 19-21, which had been found invalid by the jury in view of the Farber '598 patent.

arrive at a name server is routing via the Internet.  (Trial Tr., 70:12-16, February 14, 2008, "the routers in the Internet will cause messages to go to the nearest one of those [name servers].") This necessarily occurs **before** any resolution takes place.  The Limelight DNS server resolves requests (i.e. translates names into IP addresses) only **after** routing is completed, and without consideration whether any particular server is close or not.  (Trial Tr., 72:11-13, February 22, 2008.)  Indeed, because in most cases the servers are all in the same PoP, there is no differentiation made among the available servers.  Thus, Akamai's argument that routing using Anycast is what  identifies a "close" server actually **precludes** infringement — because routing using Anycast necessarily occurs **before** any resolution, so it cannot be done "during the resolving process" as required by the claim.

> ### 2.    No Substantial Evidence Supports a Finding That, During the Resolving Process, the Limelight System Specifies an Optimal Server That is "Tailored to Viewers in [a Particular] Location."

Akamai conceded that the accused Limelight system does not meet this criterion.  (Trial Tr., 60:21 - 61:3, February 28, 2008, Session 1.)

> ### 3.    No Substantial Evidence Supports a Finding That, During the Resolving Process, the Limelight System Specifies an Optimal Server That is "Most Likely to Already Have a Current Version of the Required File."

Akamai contended that Limelight's use of a software program called the "stickiness" tool meets this criterion.  (Trial Tr., 113:12-24, February 14, 2008.)  But it is undisputed that the stickiness tool is a software program that does not reside at "the DNS servers" and is not considered "during the resolving process."  (Trial Tr., 143:21-25, February 14, 2008, admitting that "the stickiness value [] is something computed before a request comes in to the DNS server.")

4.     **No Substantial Evidence Supports a Finding That, During the Resolving Process, the Limelight System Specifies an Optimal Server That is "Not Overloaded."**

Akamai contended that a Limelight software program called HealthD removed "overloaded" servers from those available to be selected by the Limelight DNS.  (Trial Tr., 113:5-10, February 14, 2008.)  But it is undisputed that HealthD is a software program that does not reside "at the DNS servers" and is not considered "during the resolving process."  (Trial Tr., 115:5 - 116:14, February 14, 2008); (Trial Tr., 44:4-12, February 21, 2008, testifying that GeoD and HealthD do not perform functions in response to resolution requests from users.)  The Limelight DNS server has no knowledge regarding HealthD, or any information regarding load on a server, when it performs the resolution.  (Trial Tr., 52:2-5, February 22, 2008.)

5.     **No Substantial Evidence Supports a Finding That, During the Resolving Process, the Limelight System Specifies an Optimal Server That is "Dependent on Network Conditions."**

Akamai contended that Limelight's use of Anycast caused a request to arrive at a name server based on network conditions because requests are routed via the Internet.  (Trial Tr., 104:9-12, 70:12-16, February 14, 2008, "the routers in the Internet will cause messages to go to the nearest one of those [name servers]".)  The routing via the Internet (alleged to meet this criteria) is necessarily completed **before** any request arrives at a Limelight DNS server or any resolution occurs.  (Trial Tr., 73:8-22, February 22, 2008, testifying that the resolution starts when the request arrives at the DNS server, and the use of Anycast is routing in the Internet before the request is resolved.)  It is undisputed that what Akamai has alleged does not occur "at the DNS servers" or "during the resolving process."

Thus, the conduct alleged by Akamai to meet the criteria specified by the Court does not occur at the DNS server or "during the resolving process" as required by this Court's Feb. 8, 2008 Order.[13]

### 6.    "Good" Servers Are Not "Optimal" Servers.

Even if the evidence Akamai adduced could meet some or all of these four (of the five) criteria as contended by Akamai (i.e., ignoring the fact that none of those criteria is considered by Limelight during resolution at the DNS server), Akamai at best established that Limelight selected "good" servers, rather than the required "optimal" servers as defined by this Court's orders.

For example, despite the fact that the term "good servers" is nowhere to be found in the '703 Patent, the Stipulation, or this Court's claim construction, Akamai systematically presented evidence limited to what its witnesses called "good servers":

<u>Leighton</u>, Trial Tr., February 12, 2008, Session 2 (emphasis added)

| | |
|---|---|
| 57:3 | "… servers that are going to be **good** for you …" |
| 58:4 | "… our computers that are **good** for you …" |
| 58:19 | "… the goal is to send you the **good** servers …" |

<u>Crovella</u>, Trial Tr., February 13, 2008 (emphasis added)

| | |
|---|---|
| 117:2-3 | "… to choose servers that at that location and at that time are **good** servers …" |
| 117:19 | "… that are **good** servers, serving this content to this user …" |
| 121:24-25 | "… what servers are **good** servers for serving this content." |
| 123:8 | "… servers that are **good** servers for delivering content …" |
| 125:23-25 | "… it's that translation that gets you to a **good** server, one that's a **good** server for serving the content to you…" |
| 133:4-5 | "… intelligent DNS knows which content servers are **good** ones …" |

---

[13]   Limelight sought but did not receive a jury instruction consistent with the Court's Docket # 246 Order: "The selection of an 'optimal' server based on criteria established by the specification, stated in my Order ('close to end users,' 'tailored to viewers in [a particular] location,' not 'overloaded,' 'most likely to already have a current version of the required file,' and dependent on network conditions) must occur during the resolving process."  (Docket # 264.)

Crovella, Trial Tr., February 14, 2008 (emphasis added)

| | |
|---|---|
| 7:22-23 | "… the intelligent DNS knows which servers are **good** servers …" |
| 43:20-21 | "… servers that are **good** servers for serving this particular content …" |
| 61:2-3 | "…intelligent DNS has collected servers that are **good** servers for serving …" |
| 61:13-17 | "why are they **good** servers"; "These are **good** servers because they're close to the end user, they're likely to hold the content, and they're not overloaded…" |
| 68:8-9 | "… we can select servers that are **good** servers for serving the content…" |
| 75:2 | "… servers that are **good** servers for users …" |

Crovella, Trial Tr., February 15, 2008 (emphasis added)

| | |
|---|---|
| 100:12-14 | "that's the strength of the patented method, is that it's teaching specific criteria to use to choose a **good** server …" |

Having made the conscious choice to present evidence limited to "good" servers, Akamai cannot now be heard to assert that this evidence met the "optimal" server requirement as construed by this Court.  Under Akamai's approach to characterize "optimal" as merely "good," Limelight could only avoid infringement by showing that it affirmatively selected "bad" servers.  But Akamai's proof must be measured against the claim requirements as construed by the Court.  And on this standard, Akamai's proof is insufficient.

> **D.**   **No Substantial Evidence Supports a Finding That Limelight Tags "The" Embedded Objects of the Page as Required by Claims 19, 20, and 21.**

Claim 19 of the '703 Patent requires "tagging <u>the</u> embedded objects of the page…"  No substantial evidence exists to support the jury verdict because Akamai presented no evidence that Limelight tags "<u>the</u> embedded objects of the page."  The plain meaning of "<u>the</u> embedded objects of the page" requires that <u>all</u> of the embedded objects of the page must be tagged.  Tagging <u>some</u> of the embedded objects is not enough because Claim 34 requires "tagging <u>at least some</u> of the embedded objects of the page."  Because Claims 19 and 34 are worded differently, they must be treated as such.  The claims provide a distinction between tagging "some" of the embedded objects and tagging "the" embedded objects of the page.

### E.      No Substantial Evidence Supports the Finding that Limelight "Directs or Controls" Each Step of the Asserted Claims.

Direct infringement, which was alleged by Akamai and found by the jury, requires a party to perform each and every step of a claimed method.  BMC Res., Inc. v. Paymentech, L.P., 498 F.3d 1373, 1378 (Fed. Cir. 2007).  No dispute exists that for some of the steps of Claims 19-21, and 34 of the '703 Patent, it is not Limelight that performs those steps.  Rather, it is a third party, such as Limelight's customer or companies that operate networks that comprise the Internet.  Thus, for Limelight to be liable for direct infringement, Akamai must have proven that Limelight either directed or controlled another party's performance of those steps Limelight did not perform itself.  Id. at 1380.

### 1.      No Substantial Evidence Supports the Finding that Limelight "Directs or Controls" Serving the Page.

Claim 19 includes the step of "responsive to a request for the given page received at the content provider domain, serving the given page from the content provider domain."  It is undisputed that Limelight does not receive the request for a page at the content provider (i.e. customer) domain, and does not serve the page from the content provider domain.  It is the customer, or content provider (or its designee), that receives the request and serves its page or causes its page to be served by someone else — never Limelight.  And Limelight does not direct or control the customer's action of serving its page; that task is entirely at the hands of the content provider.  (Trial Tr., 51:23 - 52:4, 52:12-14, February 14, 2008, admitting that the content provider actually serves the page); (Trial Tr., 71:19 - 73:11, February 21, 2008, testifying that Limelight does not direct or control how a customer serves its own web pages, and that many customers use third-party hosting companies, which Limelight also does not direct or control.)  Mr. Gordon further testified that many of Limelight's customers, such as Xbox and DirecTV, do not serve a page at all.  (Trial Tr., 74:11 - 76:14, February 21, 2008.)

Akamai contended at trial that because serving the page is "necessary," that a "content provider has to send the page back to the end user," and that the content provider "need[s] to send the page," those actions are legally attributable to Limelight.  (Trial Tr., 53:18 - 55:13, February 14, 2008.)  But  if "necessary" to complete the method were all that was required,  the "direction or control" test would be irrelevant.  The Federal Circuit has held that such separate, albeit "necessary," actions by different parties fail to meet the requirements for direct infringement.  In BMC Resources, the alleged infringing activity was a method of paying bills where the defendant, Paymentech, orchestrated the approval of bill payments from a customer through Paymentech to a financial institution through a debit network.  Id. at 1375-76.  While the acts of others (such as the customer and the financial institution) were "necessary" for operation of the Paymentech method of bill payment, it did not qualify as infringement.  No one party performed every step of the method, or directed or controlled the actions of others, such that one party was a direct infringer.[14]

The same is true here.  While certain customers (but not all, e.g., not Microsoft or DirecTV) necessarily serve a page or cause a page to be served to deliver their content, Limelight does not direct or control the customer's activity of serving a page.  There is no evidence otherwise.  Even were Akamai right that it is "necessary" for a customer to serve a page, that does not impute such conduct to Limelight under controlling law.

---

[14]   Additional Federal Circuit precedent holds that no direct infringement exists when multiple parties are required to perform steps of a claim.  In Cross Med Prods., Inc. v. Medtronic Sofamor Danek, Inc., 424 F.3d 1293, 1311 (Fed. Cir. 2005), the Federal Circuit found that no single party directly infringed the patent claim because the claim required the action by a surgeon in addition to the manufacturer of the accused device, even though the surgeon's use of the accused device was the intended use of the device.

**2.      No Substantial Evidence Supports a Finding that Limelight "Directs or Controls" Internet Routing.**

Claim 34  requires "resolving the client request as a function of a location of the client

machine making the request and current Internet traffic conditions."  Akamai contended at trial

that Limelight's use of Anycast (i.e., routing via the Internet) meets this limitation.  (Trial Tr.

67:13 - 74:7, 96:21 - 98:10, 104:9-12, February 14, 2008.)

But it is undisputed that Limelight does not own or operate the various networks that

comprise the Internet.  Indeed, Limelight does not control or direct the actions of those other

networks (both sides' experts agree), and no such allegation was presented.  (Trial Tr., 95:9 -

96:15, February 27, 2008, testifying that the company serving content (i.e. Limelight) cannot

control how information is routed through the Internet, and other networks in the Internet control

Internet routing); (Trial Tr., 37:11-17, February 22, 2008, testifying that Limelight does not

control how the Internet uses Anycast, or direct routers in the Internet to router requests.)

Networks on the Internet operate independently.  Because the "direct infringement" alleged by

Akamai necessarily includes the actions of multiple networks that make up the Internet, Akamai

was required to prove that Limelight either directed or controlled the action of those networks,

i.e., the Internet.  No evidence was presented (or exists) that Limelight, or any other entity,

controls or directs the Internet.  Thus, no evidence was presented of any alleged direct infringer.

Any argument from Akamai that the result of this analysis is that no one can be found to

infringe this claim is simply false.  A party using the method actually disclosed in the patent

could directly infringe Claim 34.  That is, a party actively using the user's location and Internet

traffic conditions at a top-level DNS server and then selecting a low-level DNS server (as

described in the patent) would meet these claim limitations.  It is only Akamai's attempt to

impermissibly broaden the scope of the asserted claims to cover Limelight's use of Anycast  that

causes any problem Akamai may argue exists.[15]

### 3.     No Substantial Evidence Supports a Finding that Limelight "Directs or Controls" the CNAME Method.

Akamai also contended that Limelight's customer's use of a CNAME as the "tag" of an

embedded object meets the required "tagging" limitation of each asserted claim.  (Trial Tr.,

128:22-24, February 14, 2008, identifying a customer's alias as the "tag".)  The undisputed

evidence presented at trial, however, shows that it is Limelight's customers that determine the

alias hostname (i.e. what Akamai contends is the "tag") to use on the customer's webpage to

identify where to locate a particular embedded object.  And it is the customer that returns the

CNAME to the user after a request is made for the alias hostname — not Limelight.  (Trial Tr.,

60:8 - 61:11, February 21, 2008.)  Indeed, sometimes the customer's alias hostname is in place

long before that customer decides to use Limelight to deliver its content.  (Trial Tr., 61:12 -

65:11, February 21, 2008.)

Thus, Limelight does not "direct or control" the customer's use of an alias or CNAME.

Akamai may respond that Limelight knows that its customers use a CNAME, and that its

documents allow for customers to use a CNAME.  But that is not sufficient to show direct

infringement by Limelight.  Like <u>BMC Resources</u> and <u>Cross Medical</u>, it is not enough that a

party simply knows that a third party will perform some action that may be alleged to be part of

the infringing act.  The same is true here.  To the extent that Akamai contends that the "tagging"

---

[15]   The Federal Circuit recognized concerns exist with respect to a party avoiding infringement by what it called "arms-length cooperation," but noted that a patentee is able to offset those concerns through proper claim drafting to capture infringement by a single party.  <u>Id.</u> at 1381.  The Federal Circuit further noted that in <u>BMC Resources</u>, the patentee chose to have multiple parties perform the acts within one claim, and that the court "will not unilaterally restructure the claim or the standards for joint infringement to remedy these ill-conceived claims."  <u>Id.</u>  The same is true here.  The '703 claims require multiple parties to perform the steps of the method.  There is no one party that performs those steps, or directs or controls those steps; therefore, there is no direct infringer, or direct infringement.

step is performed by the customer — sometimes long before Limelight has any involvement in delivering that customer's content — such action is not directed or controlled by Limelight as required by settled law. Accordingly, the CNAME method does not infringe the asserted claims because no single party directly infringes any claim (by performing each step or "directing or controlling" each step).

     **F.**     **No Substantial Evidence Supports a Finding that Limelight "Resolv[es] a Request to the Domain as a Function of a Requesting User's Location" as Required by Claim 21 or "Resolv[es] the Client Request as a Function of the Client Machine Making the Request" as Required by Claim 34.**

Claim 21 of the '703 Patent requires "resolving a request to the domain as a function of a requesting user's location," and Claim 34 requires "resolving the client request as a function of a location of the client machine making the request." Akamai did not provide substantial evidence for a jury to find that Limelight's system **resolves** a request **as a function of** a requesting user's location or the location of the client machine. Akamai instead relied on a results-based theory that ignored the plain language of the claim, and the only disclosure of the patent specification.

Akamai argued that Limelight's use of Anycast necessarily leads to different IP addresses returned to the users depending on which PoP received the request. (Trial Tr., 69:7 - 70:25, 73:22 - 74:7, February 14, 2008.) But Akamai never contended that the Limelight DNS actually considers the user's location **while resolving** the request (i.e. translating the name into IP addresses). Instead, Akamai's expert testified that "a function of the requesting user's location" merely requires that:

- "the resolution [] **depends on** the user's location," (Trial Tr., 65:15-24, February 14, 2008); and

- "really all that's necessary for this claim is that there's **some relationship** between location and the resolution." (Trial Tr., 71:18-21, February 14, 2008.)

No support exists for either contention.

Whether Limelight **resolves** a request **as a function of** the user's location is a legal issue; the allowable scope of the claim must be determined by the Court.  It is undisputed that "resolve" means "translate into an IP address."  What "as a function of" means as used in the claim is determined by "the scope and meaning of a patent's claims . . . ascertained in the context of the specification and the prosecution history."  (Claim Construction Order at 2.)  The Court also noted that statements in the written description describing "the invention" limit the scope of the claim to the disclosed embodiment.  (Id. at 3.)  Here, the **only** disclosure in the patent specification of  resolving as a function of user location is a method where the user's location is considered by the DNS server while resolving the request.  Notably, the "Summary of the Invention" describes how the DNS server resolves a request as a function of the user's location when it states:

> the top level DNS server **determines the user's location** in the network to identify a given low-level DNS server to respond to the request for the embedded object.

('703 Patent, col.3 ll.30-32 (emphasis added).)  The patent specification consistently, and only, describes use of the user's location during the resolution by the DNS server:

- "The top level DNS servers include appropriate control routines that are used to determine where in the network a user is located, and then to direct the user to a akamai.com (i.e., a low level DNS) server that is close-by." ('703 Patent, col.9 ll.35-39);

- "when a request comes in to a top level DNS for a resolution for a1234.g.akamaitech.net, the top level DNS looks at the return address of the requester and then formulates the response based on that address according to a network map" ('703 Patent, col.10 ll.1-5);

- "After determining where in the network the request originated, the top level DNS server redirects the DNS request to a low level DNS server close to the user in the network" ('703 Patent, col.10 ll.12-15.)[16]

Akamai contention at trial, that this claim merely requires "some relationship" between the user's location and resolution, is directly at odds with the claim language, not supported by the patent specification, and contrary to what the patent describes as "the invention."

Akamai presented no evidence that Limelight's DNS servers determine the user's location, much less consider the user's location, while **resolving** a request. Limelight's system does not determine the user's location or use that information to identify a server. (Trial Tr., 19:21 - 20:11, February 21, 2008.)

> **G.    No Substantial Evidence Supports a Finding of Limelight "Resolving the Client Request as a Function of . . . Current Internet Traffic Conditions" as Required by Claim 34.**

Claim 34 of the '703 Patent requires "resolving the client request as a function of … current Internet traffic conditions."  Akamai did not provide substantial evidence that Limelight's system **resolves** a request **as a function of** current Internet traffic conditions. Akamai instead contended that the use of Anycast causes a request to be sent to a different PoP if certain routers in the Internet have failed.  (Trial Tr., 96:21 - 98:10, 104:9-12, February 14, 2008.)  The subsequent testimony shows the flawed analysis presented by Akamai:

> the request will be sent by a different route and it could well wind up at a different region and as a result, the resolution would be different and **because the resolution is different, <u>it depends</u> -- <u>it's affected by</u>, <u>it's a function of</u>** Internet traffic conditions.

(Id. at 98:2-10, emphasis added.)  Akamai's expert, thus, explicitly applied the claim in a way that merely required that resolution "depends" or is "affected by" Internet traffic conditions.  The

---

[16]  Limelight proposed a jury instruction, consistent with the only disclosure in the written description, requiring "use of the location of the user machine during the content delivery network service provider's DNS translation of a hostname into an IP address."  (Docket # 272 (Supplemental Proposed Jury Instructions).)

claim language is not so broad. The claim specifically requires **resolving as a function of current Internet traffic conditions**.

The **only** disclosure in the specification of how resolution occurs as a function of current Internet traffic conditions is that the top-level DNS server in the patented system formulates a response based on a network map that is "continually updated based on network conditions and traffic." ('703 Patent, col.10 ll.1-11.) The top-level DNS server then directs the client request to a low-level DNS server based on the network map. (Id.) No other method of resolving as a function of current Internet traffic conditions is disclosed or suggested in the '703 Patent, and certainly nothing regarding the use of Anycast.[17]

The evidence at trial established that the Limelight DNS server does not consider "current Internet traffic conditions" when translating a hostname into an IP address (i.e. while resolving). (Trial Tr., 73:16-22, February 22, 2008.) No evidence exists that Limelight utilizes anything regarding traffic conditions during the **resolving** step of the claim. Furthermore, no evidence exists that Limelight uses a "network map" — the only method disclosed in the patent to utilize current Internet traffic conditions during resolution of a request.

Akamai's trial contention is further belied by the fact that the conduct that is alleged to meet this limitation (routing using Anycast) occurs **before** the request arrives at the Limelight DNS server — where the resolving/translating step actually occurs. Akamai simply skirted over

---

[17]   Limelight's proposed a jury instruction consistent with the patent specification that "internet traffic conditions" means "a network map that aggregates information about known Internet traffic metrics." (Docket # 272 at 3.) Besides being consistent with the specification, Limelight's proposed jury instruction was directly derived from that which Akamai used during the previous Digital Island litigation (see DX 218 (Akamai's Claim Chart for U.S. Patent No. 6,108,703) at AKL028002) — so Akamai cannot complain. Limelight also submitted a proposed instruction that "Resolving ... as a function of ... current Internet traffic conditions" means "the use of Internet traffic conditions during the content delivery network service provider's DNS translation of a hostname into an IP address." (Docket # 272 at 2.) Again, Limelight's proposed instruction is consistent with the only method disclosed in the '703 Patent.

this requirement, ignoring the fact that routing a request to Limelight's DNS server is a separate step from the resolving of that request required by the claim.

> **H.     No Substantial Evidence Supports a Finding of Limelight "Returning to the Client an IP Address of a Given One of the Content Servers Within the Given Region That is Likely to Host the Embedded Object and That is Not Overloaded" as Required by Claim 34.**

Claim 34 requires the step of "returning to the client an IP address of a given one of the content servers within the given region that is likely to host the embedded object and that is not overloaded." Akamai did not present substantial evidence to support a jury verdict that the content server IP addresses returned to the user are "likely to host the embedded object" or are "not overloaded."

> **1.     "Not Overloaded"**

Akamai relied on a Limelight software program called HealthD for its position that IP addresses returned to end users are "not overloaded." (Trial Tr., 113:5-10, February 14, 2008.) Dr. Crovella admitted that a server that is "not overloaded" will return a small object in one tenth of a second (.1 sec). (Trial Tr., 4:21 - 5:7, February 15, 2008.) He also testified that a server is "overloaded" when it "takes an abnormally long time to respond" to a request. (Trial Tr., 163:10-16, February 14, 2008.) The HealthD check is a request for a small object where a "fail" is the failure for the server to respond in 5 seconds, which is the threshold upon which Dr. Crovella bases the determination whether a server is "overloaded." (Trial Tr., 5:15-19, February 15, 2008.) But according to Dr. Crovella, a server passing a HealthD check (e.g., returning an object in 4.9 seconds) is not overloaded. (Trial Tr., 164:1-6, February 14, 2008; Trial Tr., 6:1-4, February 15, 2008.) This opinion is not reasonable — responding 49 times slower than a server that is expected to respond to a request for a small object (.1 second) is not consistent with his own testimony of when a  server is not overloaded. If an overloaded server is one that "takes an

abnormally long time to respond" to a request, taking 49 times longer is certainly abnormally long and such a server is overloaded.  (Trial Tr., 51:9-17, February 22, 2008.)

Limelight's HealthD program does not eliminate "overloaded" servers from those returned to users.  Instead, HealthD simply determines if a server is alive or dead, by measuring whether or not a server returns an object requested within certain parameters.  (Trial Tr., 46:11 - 47:14, February 21, 2008; Trial Tr., 51:18-21, February 22, 2008.)

### 2. "Likely to Host the Embedded Object"

At trial, Akamai contended that Limelight's use of a software program called the "stickiness tool" meets this criteria.  (Trial Tr., 113:12-24, February 14, 2008.)  But, as Dr. Crovella admitted, the Limelight DNS server does not know whether any content server is likely to have the particular content requested stored in cache.  (Trial Tr., 148:10-17, February 14, 2008.)  Instead, Akamai simply argued that because Limelight tries to include servers in its zone files that have served content for the particular **hostname** (Trial Tr., 130:9-11, February 22, 2008), that somehow indicates that the particular **embedded object** is likely to be stored in the cache.  Every content server must be associated with a hostname to serve content, so that cannot be an indication that any particular content is likely to be on that server.

### III. EVEN IF FOUND TO BE INFRINGED, JUDGMENT AS A MATTER OF LAW SHOULD BE ENTERED THAT THE ASSERTED CLAIMS OF THE '703 PATENT ARE INVALID.

#### A. The Peterson Presentation Anticipates the Asserted Claims — Under Akamai's Scope of the Claims.

Because the infringement theory presented by Akamai was accepted by the jury, based on the evidence and contentions presented at trial, a reasonable jury would have had to find the asserted claims invalid because they are anticipated by the Peterson Presentation (DX 19).  The

text of the Peterson Presentation, the testimony of Dr. Almeroth and the admissions of Dr. Jeffay establish the elements of the claims at issue under the scope asserted by Akamai.

As explicitly set forth in the Anticipation Appendix, attached hereto, each element of the asserted claims is found in the Peterson Presentation (applying the scope of the claims necessary to Akamai's infringement contentions), either expressly or inherently.  It is undisputed that the Peterson Presentation discloses a system for content delivery that relies on Anycast, causing user requests to be routed to the closest name server and closest content server in network terms. (Trial Tr., 94:21 - 95:8, 126:12-19, February 27, 2008; Trial Tr., 157:9 - 158:5, February 25, 2008.)  Under Akamai's infringement theory, this use of Anycast results in a resolution based on the user location and network conditions.  (Trial Tr., 128:25 - 129:11, February 27, 2008.)  It is also undisputed that Peterson discloses replicating a set of objects across a network and that at the time of the Peterson presentation, it was known to use CNAMEing to direct requests from an alias name to a hostname in a different domain.  (Trial Tr., 147:1-12, February 27, 2008.)  It is further undisputed that page splitting is inherent in the basic structure of the World Wide Web in which Peterson operates.  (Trial Tr., 108:24 - 110:11, February 27, 2008.)  Moreover, Peterson discloses use of special intelligence in BIND8 to assess server loads.  (Trial Tr., 144:20 - 145:13, February 25, 2008.)  While Dr. Jeffay initially resisted the idea that Peterson describes a system to be provided to third parties, he admitted that such services were known in the prior art, and his deposition testimony admissions established that he understood the "service servers" in Peterson to refer to servers to be used in providing services for hosting content.  (Trial Tr., 108:8-18, February 27, 2008.)

Of course, it is precisely such a system that is used by Limelight and that Akamai contends is covered by the asserted claims of the '703 Patent.  While Limelight strongly

disagrees (as discussed above) that any aspect of its CDN is covered by the claims of the '703

Patent when given their proper scope or that Akamai proved infringement by Limelight's CDN,

Akamai cannot sustain the infringement verdict without simultaneously causing the scope of the

asserted claims to fall as anticipated by the Peterson prior art.  As shown in the Anticipation

Appendix, each element of the asserted claims is shown to be found in the Peterson Presentation

when applying the scope of the claims necessary to Akamai's infringement theory, either

expressly or inherently.  Based on this record, no reasonable jury could find that Limelight

infringed Claims 19, 20, 21 and 34 of the '703 Patent without also finding those claims invalid as

anticipated by the Peterson Presentation.  Accordingly, if the infringement verdict is allowed to

stand, each of the asserted claims should be found invalid as anticipated by the Peterson

Presentation.

> **B.      The Peterson Presentation and the Other Prior Art of Record Renders the
> Asserted Claims Obvious as a Matter of Law — Under Akamai's Scope of
> the Claims.**

In KSR Int'l Co. v. Teleflex, Inc., 550 U.S. ____, 127 S.Ct. 1727 (2007), the Supreme

Court confirmed its longstanding holding from Graham v. John Deere Co., 383 U.S. 1 (1966)

that "[t]he ultimate judgment of obviousness is a legal determination."  KSR, 127 S.Ct. at 1745.

Consistent with this principle of obviousness, the Federal Circuit reviews *de novo* the ultimate

legal conclusion of obviousness.  See Daiichi Sankyo Co., Ltd. v. Apotex, Inc., 501 F.3d 1254,

1256 (Fed. Cir. 2007).  After reviewing the basic steps of the obviousness inquiry, the KSR

decision emphasized the role that a court should play in reaching a legal conclusion on the

obviousness question, comparing the court's role with that of the original patent examiner:  "If a

court, or a patent examiner, conducts this analysis and concludes the claimed subject matter was

obvious, the claim is invalid under § 103."  KSR, 127 S.Ct. at 1734.  And the Supreme Court

explained that a district court may often need to look at a variety of factors to determine whether teachings of multiple references should be combined to render obvious a claim. Id. at 1740-41.

Following KSR, courts (including the Federal Circuit) have applied the Supreme Court's holding and have affirmed or directed JMOL decisions finding patents obvious despite jury verdicts to the contrary. See, e.g., Frazier v. Layne Christensen Co., 239 F.App'x 604, 606 (Fed. Cir. 2007) (affirming district court's JMOL that the asserted claims were obvious); PharmaStem Therapeutics, Inc. v. ViaCell, Inc., 491 F.3d 1342, 1363-67 (Fed. Cir. 2007) (reversing district court's denial of JMOL and finding the patents in suit obvious because no reasonable jury could have found the claims not obvious.)

Here, given the broad scope of the claims under Akamai's infringement theory, if the jury's infringement verdict is allowed to stand, then the Peterson Presentation in combination with prior art Claim 1 and the Cisco DistributedDirector leads to the inescapable conclusion that the asserted claims are invalid as obvious. Limelight concurrently files herewith, and to which Limelight refers this Court (so as to avoid duplication of briefing), its Memorandum in Support of its Motion for Judgment of Obviousness because: (1) the prior art discloses the elements of the asserted '703 Patent claims, as admitted by Akamai's expert Dr. Jeffay; (2) undisputed evidence of a motivation to combine these prior art references exists; and (3) Akamai presented no evidence of secondary considerations. Each of these points is discussed in detail in Limelight's Memorandum in Support of its Motion for Judgment of Obviousness (filed concurrently herewith and hereby incorporated by reference), leading to the conclusion that the asserted claims are obvious if the verdict of infringement were left to stand.

IV.    **THE LOST PROFITS AND PRICE EROSION DAMAGES AWARDS ARE
       LEGALLY IMPERMISSIBLE AND NOT SUPPORTED BY SUBSTANTIAL
       EVIDENCE.**

   A.    **The Lost Profits Award is Legally Impermissible Due to the Availability of
         Non-infringing Alternatives.**

Akamai's reliance on the "adjusted market share" approach for seeking lost profits from

Limelight is improper in light of Akamai's own recognition that Limelight's switch-based

architecture does not infringe the '703 Patent.  Before 2006, Limelight's CDN architecture used

switches, which facilitated the selection of content servers.  Akamai admits that Limelight's

prior, switch-based architecture does not infringe.  (Trial Tr., 92:7-20, 106:12 - 107:6, February

19, 2008.)  Akamai's Dr. Ugone further admitted that Limelight could have continued to

compete in the content delivery market using the non-infringing switch architecture:

> ". . . Limelight switched over from the old architecture to the infringing system.
> And so, what I did in my analysis was say, okay, **they could have continued to
> compete with the old architecture**.  So, I didn't take Limelight out of the
> marketplace; I said I'll just allow them to continue to compete with that old
> architecture they had . . . ."

(Trial Tr., 102:7-22, February 19, 2008) (emphasis added).

Mr. Gordon testified that from 2001 through 2005 Limelight had successfully built its

business and successfully delivered content for several large events using the previous switch-

based alternative, including the November 2004 Presidential election, and the 2005 election of

the new Pope — both for Limelight's customer MSNBC.  (Trial Tr., 83:15 - 84:2, February 21,

2008.)  Indeed, at that time, the election of Pope Benedict XVI was the largest event ever on the

Internet.  Id.  And though the prior architecture was not perfect in all respects, as Mr. Gordon

testified, "it worked just fine to that point [and] would have worked just fine for a long time to

come."  (Trial Tr., 85:20 - 86:1, February 21, 2008.)

The evidence Akamai presented through depositions of Limelight's employees does not negate the availability of this non-infringing alternative. Each testified about Limelight's use of the switch-based architecture prior to 2006, and the improvements that might have been done to continue using it. (Dep. of Michael Gordon, 156:5-25 (PX 713), Trial Tr., 54:18-20, February 19, 2008; Dep. of Nils McCarthy, 91:15-19 (PX 717), Trial Tr., 60:11-13, February 19, 2008; Dep. of Brad Harvell, 203:17 - 206:6 (PX 715); Trial Tr., 64:5-19, February 19, 2008.) The fact that Limelight did not ultimately continue with its switch based solution, or investigate buying larger switches at the time, does not negate the viability or acceptability of its prior architecture. Nor does a higher cost for the alternative compared with what actually occurred render the substitute unavailable for the lost profits analysis. Grain Processing Corp. v. Am. Maize Prods. Co., 185 F.3d 1341, 1351 (Fed. Cir. 1999). Rather, consistent with the "but-for" nature of the analysis, the infringer is entitled to show what it would have done if it had known it was infringing. Id. at 1351.

The fact that Limelight chose not to continue with or upgrade the switch system in 2005 (because it had no notice or belief that its new system might be considered to infringe the '703 Patent) so that it could compete on a non-infringing basis, is not determinative. See Slimfold Mfg. Co. v. Kinkead Indus., Inc., 932 F.2d 1453, 1458 (Fed. Cir. 1991) (affirming denial of lost profits where the patentee did not show that the alleged infringer would not have made a substantial portion or the same number of sales had it continued with its old hardware).

To recover lost profits, Akamai was required to show the absence of non-infringing alternatives. Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152, 1156 (6th Cir. 1978). The market share analysis relied on by Akamai accounts for the situation where there are multiple competitors in the market. That approach alone, however, is not enough to establish the

"but for" causation required to support an award of lost profits.  See, e.g., Grain Processing

Corp., 185 F.3d at 1350 ("a fair and accurate reconstruction of the 'but for' market also must

take into account . . . alternative actions the infringer foreseeably would have undertaken had he

not infringed."); Fuji Photo Film Co., Ltd. v. Jazz Photo Corp., 249 F.Supp.2d 434, 455 (D. N.J.

2003) (holding that plaintiff's reliance on proof of its own market share, without more, was

insufficient as a matter of law to support a reasonable probability of "but for" causation of lost

profits where defendants could have continued to compete in a non-infringing manner).  "[O]nly

by comparing the patented invention to its next-best available alternative(s) - regardless of

whether those alternative(s) were actually . . . sold during the infringement - can the court

discern the market value of the patent owner's exclusive right, and therefore his expected profit."

Grain Processing Corp., 185 F.3d at 1351.

Far from proving the absence of non-infringing alternatives, Akamai admits that they

exist — i.e., at minimum, Limelight's prior switch-based solution.  Indeed, the unrebutted

testimony of Limelight's witnesses showed that such an alternative was available and capable of

handling large customers and large events.

In addition, Akamai's reliance and application of the market share approach for lost

profits was flawed based on prevailing law.  The evidence showed numerous non-infringing

alternatives available to customers — at prices similar to Limelight's and substantially lower than

those of Akamai's.  (DX 580 at 9; DX 315 at 3-5.)  Instead of performing a direct computation of

actual customers lost to Limelight, which Akamai could have done with the available evidence

(Trial Tr., 33:4 - 34:23, February 20, 2008; Trial Tr., 61:5-22, February 26, 2008, Session 1),

Akamai simply presented evidence of its market share, which does not presume causation for

lost profits.  BIC Leisure Prods. Inc. v. Windsurfing Int'l, Inc., 1 F.3d 1214, 1218 (Fed. Cir.

1993) (rejecting the award of lost profits when the infringing product's price was almost half of patentee's product, and several other competitors offered products at the same lower price as the infringing product).  Akamai never proved that the vast majority of Limelight's customers would have purchased CDN services from Akamai at double or triple the price.

Akamai admitted the existence of non-infringing alternatives, negating its lost profits claim.  And Akamai failed to prove that Limelight's customers would have purchased CDN services from Akamai at double or triple the price.  Accordingly, Akamai's lost profits award is not supported by substantial evidence and should be set aside.

**B.      The Price Erosion Damages Award is Not Supported by Substantial Evidence.**

Akamai offered no substantial proof that Limelight caused Akamai to reduce its prices for those seven customers for which Akamai alleges price erosion.  At best, Edward McGowan, Akamai's Vice President of Corporate Development, testified that Akamai **thought** Limelight was competing for those seven accounts.  The evidence on which he relied, however, was admitted solely to show Akamai's state of mind, not for the truth of the matters stated therein. (Trial Tr., 145:1-19, February 15, 2008, instructing the jury, "the witness can tell you . . . that . . . Akamai thought that Limelight was going to be competing for the same business . . . . That is not, however, and cannot be proof of the fact that Limelight was, in fact, competing with Akamai for this business.")  And even if Limelight did compete for that business at some point, Akamai presented no evidence concerning when that competition took place, what prices Limelight was offering, or whether Limelight was offering infringing services to those customers.

To recover price erosion damages, Akamai must prove not only that it thought it was competing with Limelight when it dropped its prices, but also that in fact Limelight caused price erosion damages.  See BIC Leisure Prods., 1 F.3d at 1220 (explaining that to prove price erosion

damages, the patentee must show that **but for** the infringement, it would have been able to charge the higher price).

In this case, Akamai presented no such evidence as to causation. To the contrary, the evidence showed multiple alternative causes of the price pressure Akamai supposedly experienced.[18] Mr. McGowan also admitted that there were various other competitors in the CDN market besides Limelight that were offering more competitive prices than Akamai. (Trial Tr. 156:2 - 157:22, February 15, 2008.) For example, Mr. McGowan admitted that with respect to Pointroll and Metacafe — two of the accounts in which Limelight allegedly caused priced erosion — that Akamai **thought** other third-party CDN suppliers were competing for the business. (Trial Tr., 27:7-15, February 19, 2008, testifying about competition from Panther Express, Vital Stream, 9 Systems, and Savvis for the Pointroll account); (Trial Tr., 28:8-11, February 19, 2008, testifying that Akamai believed it competed with both Limelight and Level 3 for the Metacafe account.)[19] Akamai's own documents show that Akamai experienced price pressure from multiple other sources. (See, e.g., DX 35 at AKL097783 (Akamai's "Competitive Landscape Analysis," noting price pressure from competition in general and the do-it-yourself method).) And besides competition from other CDNs, Mr. McGowan identified other factors that were affecting Akamai's pricing, including Akamai's own decreasing costs for bandwidth and equipment over time. (Trial Tr. 14:12 - 15:10, February 19, 2008.)

---

[18]   On direct, Mr. McGowan addressed only two of the seven customers — Major League Baseball, and VideoEgg. (Trial Tr. 141:17 - 152:23, February 15, 2008.)

[19]   With regards to Metacafe, Mr. McGowan further admitted that Metacafe is a company based in Israel. (Trial Tr. 29:1-8, February 19, 2008.) Akamai has otherwise excluded Limelight's sale of CDN services to foreign customers from its infringement claims. (Trial Tr. 106:12-19, February 19, 2008.) There is no basis, let alone evidence presented, showing that Akamai is entitled to price erosion damages on account of competition taking place outside the United States.

The fact that an Akamai witness "thought" that Limelight caused price erosion is not sufficient proof to support the jury's $4,000,000 price erosion award.  And Akamai's expert, who did the price erosion calculations testified that he did not have the underlying factual support for his calculations, but assumed that would come in through another Akamai witness.  (Trial Tr. 41:7-16, February 20, 2008.)  But Akamai never offered that factual support.  Because the jury's price erosion damage award is not supported by substantial evidence, it should be overturned.

## V.    CONCLUSION

For the foregoing reasons, Limelight respectfully requests that the Court grant its Motion for Judgment as a Matter of Law ("JMOL") under Fed. R. Civ. P. 50 that Limelight does not infringe the '703 Patent, or that (if found to be infringed) the asserted claims are invalid.

DATED: March 21, 2008

Respectfully submitted,

LIMELIGHT NETWORKS, INC.

By its attorneys,

/s/ Robert G. Krupka
    Robert G. Krupka (pro hac vice)
    Alexander F. MacKinnon (pro hac vice)
    Kirkland & Ellis LLP
    777 South Figueroa Street
    Los Angeles, California 90017
    Telephone:  (213) 680-8400
    Facsimile:  (213) 680-8500

    Gael Mahony (BBO #315180)
    Daniel K. Hampton (BBO #634195)
    Holland & Knight LLP
    10 St. James Avenue, 11th Floor
    Boston, MA, 02116
    Telephone:  (617) 523-2700
    Facsimile:  (617) 523-6850

Attorneys for Defendant
Limelight Networks, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 23, 2008, a copy of **LIMELIGHT NETWORKS, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTIONS FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R. CIV. P. 50 [LEAVE TO FILE GRANTED 4/23/2008]** was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants, via first class mail.


/s/ Robert G. Krupka
Robert G. Krupka