# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AKAMAI TECHNOLOGIES, INC., and MASSACHUSETTS INSTITUTE OF TECHNOLOGY, <br><br>                   Plaintiffs, <br><br>    v. <br><br> LIMELIGHT NETWORKS, INC., <br><br>               Defendant. | Civil Action No. 1:06-cv-11109 RWZ <br><br> LEAVE TO FILE GRANTED ON DECEMBER 8, 2008 |

## LIMELIGHT NETWORKS, INC.'S POST-TRIAL BRIEF REGARDING INEQUITABLE CONDUCT, EQUITABLE ESTOPPEL, LACHES AND UNCLEAN HANDS

## TABLE OF CONTENTS

**Page No.**

I.   INTRODUCTION ..................................................................................................1

II.  APPLICANTS COMMITTED INEQUITABLE CONDUCT ...........................................4

A.   Applicants Withheld Material Information From The PTO ...................................5

1.   Applicants Knew Detailed Information About Sandpiper And The
     Footprint 1.0 CDN During Prosecution Of The '703 Patent ......................5

     a.   Mr. Lewin's Knowledge About Sandpiper And The
          Footprint 1.0 CDN ...........................................................5

     b.   Dr. Leighton's Knowledge About Sandpiper And The
          Footprint 1.0 CDN ...........................................................7

     c.   Mr. Judson's Knowledge About Sandpiper And The
          Footprint 1.0 CDN ...........................................................8

2.   The Information Withheld By Applicants About The Footprint 1.0
     CDN Was Material To Patentability Of The '703 Patent ...........................8

3.   The Information Applicants Withheld About The Footprint 1.0
     CDN Was Not Cumulative To Art Before The Examiner. .......................11

     a.   Akamai's Expert, Dr. Jeffay, Admitted That Kriegsman
          And Kenner Do Not Disclose Everything Of Relevance
          In The Footprint 1.0 CDN...............................................11

     b.   Applicants Distinguished Prior Art Before the Examiner
          In A Way They Could Not Distinguish The Footprint
          1.0 CDN .........................................................................13

B.   Applicants Intended To Deceive The PTO In Failing To Disclose
     Sandpiper And The Footprint 1.0 CDN................................................14

1.   Applicants Intentionally Withheld Known Information About
     Sandpiper And The Footprint 1.0 CDN To Deceive The PTO.................16

2.   Applicants' Failure To Search For "Sandpiper" Or "Footprint" In
     Connection With Their Petition To Make Special Is Further
     Evidence Of Intent To Deceive.................................................18

3.   Applicants' Failure To Appropriately Investigate Known
     Information Further Evidences Their Intent To Deceive The PTO. .........21

        4.      Applicants' Lack Of Credibility Further Supports The Conclusion That They Intended To Deceive The PTO.................................................24

III.    AKAMAI'S CLAIMS ARE PRECLUDED BY EQUITABLE ESTOPPEL, LACHES, AND UNCLEAN HANDS ................................................................26

    A.    Akamai Is Equitably Estoppel From Obtaining Any Relief.................................26

        1.      Akamai Misled Limelight And Caused It To Believe That Akamai Would Not Sue Limelight For Patent Infringement ................................27

            a.      During The 2004 Acquisition Discussions, Akamai Learned Of Business And Technical Information About Limelight's CDN ...........................................................................................27

            b.      Akamai's Misleading Conduct And Communication — During And After The 2004 Acquisition Talks — Caused Limelight To Believe Akamai Would Not Sue For Patent Infringement ...........29

        2.      Limelight Reasonably Relied On Akamai's Misleading Conduct And Communications By Investing In And Expanding Its CDN Business ................................................................................................32

        3.      Limelight Will Be Materially Harmed If Akamai Is Allowed To Enforce The Jury Verdict Despite Its Misleading Conduct And Communications .........................................................................................33

    B.    Akamai Is Barred By Laches From Obtaining Damages Before June 2006 .........33

        1.      Akamai Knew Of Limelight's CDN Since October 2001 .........................34

        2.      Akamai's Delay From 2001 To 2006 Was Unreasonable .........................35

        3.      Akamai's Delay Has Caused Economic And Evidentiary Prejudice To Limelight ..............................................................................................36

        4.      Akamai's Delay Is Not Excused By Its Waiting Until Limelight Grew Into A Larger Competitor Or Until The Speedera Litigation Ended ...................................................................................................37

    C.    Akamai's Claim Is Barred By Unclean Hands ....................................................38

IV.    CONCLUSION...............................................................................................................38

## TABLE OF AUTHORITIES

<u>CASES</u>                                                                    <u>Page No.</u>

<u>A.C. Aukerman Co., v. R.L. Chaides Const. Co.,</u>
  960 F.2d 1020 (Fed. Cir. 1992)....................................................................26, 33, 36, 37

<u>Aptix Corp. v. Quickturn Design Sys., Inc.,</u>
  269 F.3d 1369 (Fed. Cir. 2001)...........................................................................38

<u>Baker Mfg. Co. v. Whitewater Mfg. Co.,</u>
  430 F.2d 1008 (7th Cir. 1970) ............................................................................37

<u>Baxter Int'l, Inc. v. McGaw, Inc.,</u>
  149 F.3d 1321 (Fed. Cir. 1998).............................................................................9

<u>Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.,</u>
  267 F.3d 1370 (Fed. Cir. 2001)...............................3, 5, 14, 15, 17, 18, 20, 21, 22, 23, 24

<u>Bristol-Myers Squibb Co., v. Rhone-Poulene Rorer, Inc.,</u>
  326 F.3d 1226 (Fed. Cir. 2003)...........................................................................22

<u>Bruno Indep. Living Aids v. Acorn Mobility Servs., Ltd.,</u>
  394 F.3d 1348 (Fed. Cir. 2005)..............................................................................1

<u>Ferring B.V., v. Barr Labs, Inc.,</u>
  437 F.3d 1181 (Fed. Cir. 2006)...........................................................................14

<u>FMC Corp. v. Hennessy Indus., Inc.,</u>
  836 F.2d 521 (Fed. Cir. 1987).............................................................................22

<u>GFI, Inc. v. Franklin Corp.,</u>
  265 F.3d 1268 (Fed. Cir. 2001)........................................................................5, 18

<u>GFI, Inc. v. Franklin Corp.,</u>
  88 F. Supp.2d 619 (N.D. Miss. 2000)..................................................................20

<u>Giese v. Pierce Chem. Co.,</u>
  29 F. Supp.2d 33 (D. Mass. 1998) ......................................................................29

<u>Keystone Driller Co. v. General Excavator Co.,</u>
  290 U.S. 240 (1933)............................................................................................38

<u>LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n,</u>
  958 F.2d 1066 (Fed. Cir. 1992)...........................................................................14

<u>Molins PLC v. Textron, Inc.,</u>
  48 F.3d 1172 (Fed. Cir. 1995).............................................................................14

Monsanto Co. v. Bayer Bioscience N.V.,
    514 F.3d 1229 (Fed. Cir. 2008)..............................................................13, 14

Praxair, Inc. v. ATMI, Inc.,
    543 F.3d 1306 (Fed. Cir. 2008)........................................................................25

Precision Inst. Mfg. Co. v. Auto. Maint. Mach. Co.,
    324 U.S. 806 (1945)..........................................................................................38

Purdue Pharm. L.P. v. Endo Pharm. Inc.,
    438 F.3d 1123 (Fed. Cir. 2006)........................................................................13

Raber v. Pittway Corp.,
    Case No. C922581, 1994 WL 374542 (N.D. Cal. July 11, 1994) ..................29, 31, 32, 36

Rothman v. Target Corp.,
    Case No. 054829, 2008 WL 1995129 (D.N.J. May 6, 2008) .....................17, 18

Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.,
    204 F.3d 1368 (Fed. Cir. 2000)........................................................11, 12, 17

Studiengesellschaft Kohle mbH v. Eastman Kodak Co.,
    616 F.2d 1315 (5th Cir. 1980) ..........................................................................26

Wafer Shave, Inc. v. Gillette Co.,
    857 F. Supp. 112 (D. Mass. 1993) ...................................................................35

Wanlass v. Gen. Elec. Co.,
    148 F.3d 1334 (Fed. Cir. 1998).................................................................34, 35

## STATUTES

37 C.F.R. § 1.111(b) and (c) ......................................................................................19

37 C.F.R. § 1.56 ("Rule 56") .......................................................................................9

35 U.S.C. 102(e) or 103 ..............................................................................................18

## GUIDELINES

M.P.E.P. § 706.02(l)(III)...............................................................................................18

M.P.E.P. § 708 .......................................................................................................18, 19

## I.    INTRODUCTION.

The clear and convincing evidence at the November 12-14, 2008 bench trial showed that the inventors of U.S. Patent No. 6,108,703 ("'703 Patent") and the attorney who prosecuted that patent — collectively, "Applicants"[1] — committed inequitable conduct by failing to disclose or appropriately investigate known information concerning Sandpiper and the prior art Footprint 1.0 CDN with intent to mislead the United States Patent and Trademark Office ("PTO").  The evidence further showed that Akamai's misleading conduct and unreasonable delay in filing suit establish Limelight's equitable defenses of equitable estoppel, laches, and unclean hands.

Specifically, it is undisputed that U.S. Patent No. 6,185,598 ("'598 Patent") — the patent that invalidated Claims 1 and 3 of the '703 Patent in the Digital Island lawsuit — discloses the architecture of the Footprint 1.0 CDN, originally offered by Sandpiper Networks in early 1998, before the provisional application filed by Applicants.  The Examiner of the '703 Patent did not have, and therefore could not consider, any prior art related to Sandpiper or the Footprint 1.0 CDN when he allowed the claims of the '703 Patent.  But Applicants knew of Sandpiper and the Footprint 1.0 CDN, when the application for the '703 Patent was filed and while it was pending, including technical details about its architecture and operation, and also that Sandpiper had filed a patent application covering the Footprint 1.0 CDN.  Applicants, individually and collectively, intentionally withheld this information from the PTO, and breached their duty to investigate materiality based on the information they did know.

Since at least September 1998, eight months before the non-provisional application for the '703 Patent was filed, inventors Leighton and Lewin knew about the Footprint 1.0 CDN, and during 1998 and 1999 they extensively studied Sandpiper and its website in order to further learn how the Footprint 1.0 CDN operated.  Dr. Leighton admits that he used this knowledge of the Footprint 1.0 CDN during 1999 to explain to potential customers how the Footprint 1.0 CDN

---

[1]  "In the context of an inequitable conduct determination, an 'applicant' includes anyone under a duty to disclose material information to the PTO pursuant to 37 C.F.R. § 1.56, namely: the inventor, the prosecuting attorney or agent, and anyone associated with the inventor or the assignee who is substantively involved in the preparation or prosecution of the application."  Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd., 394 F.3d 1348, 1351 n.3 (Fed. Cir. 2005).

worked.  During this timeframe, Akamai also prepared a detailed competitive and technical evaluation of Sandpiper and its CDN.  Thus, Sandpiper and its Footprint 1.0 CDN were very much on the minds of Applicants during the prosecution of the '703 Patent because Sandpiper was the key competitor that offered a directly competitive CDN service.  Moreover, in press releases on the Sandpiper website that Mr. Lewin admitted he reviewed "almost daily," Sandpiper reported that it had begun testing the Footprint 1.0 CDN with customers as early as May 1998 (before the earliest possible priority date that Applicants could claim for the '703 Patent) and that Sandpiper had filed its own patent application for protection of its CDN system. Patent attorney Judson, who prosecuted the '703 Patent, admits that in 1999 he also knew of Sandpiper and understood how the Footprint 1.0 CDN worked.

Despite all of this information, Applicants individually and collectively failed to disclose even a single fact about Sandpiper or the Footprint 1.0 CDN to the PTO during prosecution of the '703 Patent.  After doing nothing to prosecute the '703 Patent (other than filing a non-provisional application) for 14 months since filing their provisional application, they suddenly sprung into action and filed a Petition to Make Special.  The Petition sought an accelerated prosecution, just six weeks after Sandpiper's PCT Application relating to the Footprint 1.0 CDN was published.  That PCT Application identified the pending Sandpiper U.S patent application, which led to the prior art '598 Patent with an earlier priority than the '703 Patent application.

Applicants failed to act with candor and in good faith in filing the Petition to Make Special.  The Petition required Applicants to conduct a prior art search and submit relevant information from that search to the Examiner.  However, Dr. Leighton and Mr. Lewin ignored Sandpiper and its Footprint 1.0 CDN, instructing their attorney Mr. Judson to instead search for prior art from five other companies working on mirroring issues, but not from their key CDN competitor Sandpiper.  With Sandpiper, the Footprint 1.0 CDN, and all foreign records excluded, Mr. Judson's search predictably failed to uncover Sandpiper's PCT Application.  Because Dr. Leighton and Mr. Lewin concealed all information they knew about the Footprint 1.0 CDN and because their attorney (at their direction) conducted unreasonably narrow searches that avoided

uncovering Footprint and Sandpiper in connection with the Petition to Make Special, the Examiner knew nothing of the highly material Footprint 1.0 CDN prior art when he granted the Petition to Make Special (accelerating the prosecution) and when he allowed the '703 Patent.

Moreover, Applicants' knowledge of Sandpiper and the Footprint 1.0 CDN created a duty to investigate the materiality of this information to determine its relevance to the patentability of the '703 Patent.  Having notice that material prior art likely existed, Applicants could not "ignore that notice in an effort to avoid [their] duty to disclose."  Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp., 267 F.3d 1370, 1383 (Fed. Cir. 2001).  Yet, they did just that.  Applicants offered non-credible reasons for their failure to disclose or appropriately investigate the materiality of Sandpiper or the Footprint 1.0 CDN: Dr. Leighton claimed  "[i]t didn't occur to me to do so," and Mr. Judson asserted "it wasn't frankly on my radar screen."  But the evidence showed that it was on Applicants' radar screen, constantly, during prosecution of the '703 Patent.  Their disregard of their duty to investigate the materiality of prior art known to them — and their failure to disclose the material information about Sandpiper and the Footprint 1.0 CDN that they admittedly knew — shows that Applicants intended to and did conceal material information from the PTO. That is inequitable conduct.

Apart from Applicants' inequitable conduct, Akamai unreasonably delayed filing suit and engaged in misleading conduct and communications with Limelight, which bar its claim on the grounds of equitable estoppel, laches, and unclean hands.  As the evidence showed, over the course of lengthy acquisition discussions in 2004, followed by silence in 2005 and early 2006, Akamai affirmatively misled Limelight into believing that Akamai had no intention of asserting its patents against Limelight.  From April through October 2004, Akamai and Limelight met and discussed the potential acquisition, during which Limelight provided Akamai with substantial, detailed technical and business information about Limelight's CDN.  These discussions included Akamai touting its patent portfolio and aggressive legal actions against other competitors. When the discussions ended in October 2004, Akamai's Robert Wood congratulated Limelight on the great business Limelight had built, and expressly stated he was "glad to hear" about the

tremendous value Limelight was going to receive for its business.  Akamai never once during those discussions, or at any time until this lawsuit in June 2006, suggested any potential infringement issue with Limelight's CDN business.  Akamai's conduct and communications affirmatively misled Limelight to increase its investments in, and contracts relating to, its CDN business, and to forego opportunities to diversify into other businesses.  Akamai, having affirmatively misled Limelight into increasing its investment in its CDN business, should be equitably estopped from changing its position and now claiming infringement by that business.

Akamai also knew of Limelight as a CDN competitor since 2001, referring to Limelight in a number of internal communications beginning at that time, including documents reflecting Akamai's study of the Limelight CDN and knowledge of Limelight as a competitor.  In April 2002, Akamai created a document for its sales force entitled "How To Beat Limelight Networks," and by October 2003, Akamai referred to Limelight as "a key competitor in several accounts."  During this time, Akamai developed information about how Limelight's CDN worked, and compounded this with a wealth of due diligence information it received during the 2004 acquisition talks.  Yet, Akamai slept on its rights until it filed suit in June 2006, never even intimating that Akamai had, or was investigating, a potential patent claim against Limelight.  Akamai's failure to act for five years — which caused economic as well as evidentiary harm to Limelight (many documents and memories relating to important facts are now gone) — establishes laches that bars any prefiling damages.

Finally, the conduct establishing equitable estoppel and laches, as well as Akamai's inequitable conduct before the PTO, also bars Akamai's claims on the ground of Akamai's unclean hands, particularly given the important public interest implicated by enforcement of unfairly obtained patent rights.

## II.    APPLICANTS COMMITTED INEQUITABLE CONDUCT.

"Determination of inequitable conduct, for establishing that a patent is unenforceable, requires a two-step analysis.  First, the trial court must determine whether the withheld information meets a threshold level of materiality.  Second, the district court must then also

determine whether the evidence shows a threshold level of intent to mislead the PTO."
<u>Brasseler</u>, 267 F.3d at 1379 (citation omitted).  As shown below, clear and convincing evidence establishes that the information known to Applicants about Sandpiper and the Footprint 1.0 CDN was material and that Applicants' failure both to disclose what they knew or to appropriately investigate that information proves Applicants' intent to mislead the PTO.

> **A.    Applicants Withheld Material Information From The PTO.**

Applicants were each well aware of Sandpiper and the Footprint 1.0 CDN during prosecution of the '703 Patent, especially during the preparation and pendency of the Petition to Make Special filed in September 1999.  Applicants, however, individually and collectively, withheld all such information from the PTO.  The information withheld was material to the patentability of the '703 Patent and was not cumulative to prior art before the Examiner.

> **1.    Applicants Knew Detailed Information About Sandpiper And The Footprint 1.0 CDN During Prosecution Of The '703 Patent.**

During prosecution of the '703 Patent, Applicants collected detailed information about Sandpiper and the Footprint 1.0 CDN.  This information could have and should have been disclosed to the PTO during prosecution of the '703 Patent.  As Akamai's expert Mr. Kunin admitted, a system in public use in the United States, such as the Footprint 1.0 CDN, is valid prior art.[2] FF60.[3]  Despite Applicant's knowledge of Sandpiper and the Footprint 1.0 CDN, they worked together to systematically, and improperly, withhold this information from the PTO.

> **a.    Mr. Lewin's Knowledge About Sandpiper And The Footprint 1.0 CDN.**

Mr. Lewin began investigating Sandpiper by at least August or September 1998.  FF33.
He and others at Akamai read the Sandpiper website in great detail to get an overview of (1) what Sandpiper was doing, (2) what Sandpiper's business was, (3) who was involved with

---

[2]  In addition, "[m]ateriality is not limited to prior art but instead embraces *any information* that a reasonable examiner would be substantially likely to consider important in deciding whether to allow an application to issue as a patent."  <u>GFI, Inc. v. Franklin Corp.</u>, 265 F.3d 1268, 1274 (Fed. Cir. 2001) (emphasis added); <u>Brasseler</u>, 267 F.3d at 1380.  Accordingly, the existence of Sandpiper as a competitor with a pre-existing CDN was material and should also have been disclosed, especially because if Applicants had disclosed Sandpiper the Examiner would have been alerted to the co-pending application for the '598 Patent.

[3]  Citations in the form "FF__" refer to proposed findings of fact, along with supporting citations to the record, set out in Limelight's Proposed Findings Of Fact And Conclusions Of Law (Exhibit A hereto).

Sandpiper's business, and (4) what Sandpiper's overall benefits were to customers.  Mr. Lewin also looked at the network infrastructure of the Footprint 1.0 CDN.  He analyzed the Footprint 1.0 CDN by observing how requests were directed and redirected to specific servers.  FF33.

Once Mr. Lewin discovered Sandpiper Networks in August/September 1998, he began monitoring the Sandpiper website on an almost daily basis to keep track of what Sandpiper was working on.  FF34.  Mr. Lewin continued to monitor Sandpiper and analyze the Sandpiper CDN until at least May 11, 1999, when Mr. Lewin had the Footprint CDN "reverse engineered" to figure out how that system worked.  FF42.

The Sandpiper website that Mr. Lewin monitored "almost daily" included press releases that announced, for example, that Sandpiper had begun testing its new service, which "adapts to fluctuating network conditions by intelligently distributing fresh and popular web content closer to end users," at "various websites and web hosters nationwide" almost two months before the provisional application for the '703 Patent was filed.  FF9, FF36.  Another press release on the Sandpiper website announced Sandpiper's commercial launch of the Footprint 1.0 CDN, and discussed Sandpiper's "***patent-pending***" distribution network that "redirects users to the optimal Content Distributor" and "embodies the concept of Adaptive Content Distribution, a new category of intelligent delivery services that can recognize and respond to changes in network conditions, user demands, and system loads."  FF37.

Accordingly, during prosecution of the '703 Patent and starting as early as August or September 1998, Mr. Lewin knew that Sandpiper had a content delivery network that was "patent-pending" and that was publicly tested ***before*** the provisional application of the '703 Patent was filed.  Mr. Lewin had also collected information about how the Footprint 1.0 CDN worked by going to the Sandpiper website, reading information about the Footprint 1.0 CDN, and analyzing how requests were directed and redirected to specific servers.  However, Mr. Lewin never disclosed any of this information to his patent attorney, Mr. Judson, or to the PTO, including the information that he had collected about Sandpiper and the Footprint 1.0 CDN while monitoring the Sandpiper website.  FF34, FF170.

> **b.  Dr. Leighton's Knowledge About Sandpiper And The Footprint 1.0 CDN.**

Dr. Leighton also knew of Sandpiper and the Footprint 1.0 CDN in the Fall of 1998. FF38.  Among other things, Dr. Leighton (along with others at Akamai) was told by Mr. Lewin what he knew about Sandpiper and the Footprint 1.0 CDN in August or September 1998.  FF39.

In 1998 and 1999, Dr. Leighton developed an in-depth and detailed understanding of the Footprint 1.0 CDN.  He looked at how the Footprint 1.0 CDN delivered pages from various points around the country and was able to download pages being served by the Footprint 1.0 CDN, determine where the pages originated, and learn what delivery process was used.  FF40. He also understood that a request was intercepted and redirected to a best repeater in the Footprint 1.0 CDN.  FF45.  And Dr. Leighton knew that the Footprint 1.0 CDN could prepend either a hostname or an IP address onto a URL.  Although at the November 2008 trial Dr. Leighton claimed not to have known this, he previously witnessed one of the inventors of the '598 Patent, David Farber, testify that the Footprint 1.0 CDN modified "at least one embedded object URL of a web page to include a host name prepended to a domain name and a path." FF41.  And Dr. Leighton himself testified at the Digital Island trial, based on information he acquired while the '703 Patent application was pending,[4] that the Footprint 1.0 CDN could prepend a repeater-identifying hostname onto a hostname and path.  FF41, FF44.

Dr. Leighton also knew of information about Sandpiper and its Footprint 1.0 CDN from a 24-page document entitled "Competitive Overview:  Sandpiper Networks" that Akamai generated in September 1999.  FF49.  The Competitive Overview included a detailed discussion of both technical and marketing aspects of Sandpiper and specifically addressed the architecture and operation of the Footprint 1.0 CDN.  Specifically, the Competitive Overview discussed (i) one of the ways that the Footprint 1.0 CDN prepended information about the CDN to the content provider's host name and path, (ii) how the Footprint 1.0 CDN intercepts client requests and redirects them to servers better suited to deliver the content, (iii) that Akamai's approach to

---

[4]  Dr. Leighton admitted during the recent bench trial that his knowledge of the Footprint 1.0 CDN in the Digital Island trial came from statements by Sandpiper and others about the Footprint 1.0 CDN made before the Digital Island litigation began, while the '703 Patent application was pending.  FF43.

content delivery was "less mature" than Sandpiper's approach, and (iv) that Sandpiper had marketed its CDN before Akamai brought its CDN to market.  FF50-52.  Dr. Leighton testified extensively about the Competitive Overview document at the bench trial and also confirmed these points about operation of the Footprint 1.0 CDN.  FF49.

By the middle of 1999, Dr. Leighton used his knowledge of the Footprint 1.0 CDN to discuss Sandpiper and the Footprint 1.0 CDN with Akamai's customers, describing for them how the Footprint 1.0 CDN technically operated.  FF46.  Nevertheless, despite his knowledge of Sandpiper and the Footprint 1.0 CDN in 1998 and 1999, and extensive use of that information in Akamai's business, Dr. Leighton admits he never disclosed any of this information to the PTO. FF88, FF91, FF119.

### c. Mr. Judson's Knowledge About Sandpiper And The Footprint 1.0 CDN.

Mr. Judson was also fully aware of Sandpiper and the Footprint 1.0 CDN during prosecution of the '703 Patent.  He learned of Sandpiper no later than the Spring or Summer of 1999, when Akamai asked him to conduct an investigation of Sandpiper's 2.0 CDN.  FF47.  Mr. Judson admits that, as a result of this investigation, he became aware of the Footprint 1.0 CDN and developed an understanding of how the Footprint 1.0 CDN worked.  FF47.  He understood that the Footprint 1.0 CDN was a system that could intercept requests, make a decision where the requests would be serviced, and then send back an address to the client of where to go to get the content.  He also knew that the Footprint 1.0 CDN was a content delivery network, much like the invention of the '703 Patent.  FF47.  And Mr. Judson discussed Sandpiper with Dr. Leighton between the Fall of 1999 and the Fall of 2000.  FF48.  Yet Mr. Judson never informed the PTO about the Footprint 1.0 CDN during prosecution of the '703 Patent.  FF30, FF90-91.

### 2. The Information Withheld By Applicants About The Footprint 1.0 CDN Was Material To Patentability Of The '703 Patent.

Information is material to patentability when:

it is not cumulative to information already of record or being made of record in the application, and

(1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or

(2) It refutes, or is inconsistent with, a position the applicant takes in:

> (i) Opposing an argument of unpatentability relied on by the Office, or

> (ii) Asserting an argument of patentability.

37 C.F.R. § 1.56 ("Rule 56"). A reference that is material to even a single claim of a patent application must be disclosed, because inequitable conduct with respect to one claim of a patent renders the entire patent unenforceable. See, e.g., Baxter Int'l, Inc. v. McGaw, Inc., 149 F.3d 1321, 1332 (Fed. Cir. 1998). This was confirmed by Akamai's patent expert, Mr. Kunin, who admitted that information material to the patentability of at least one pending claim should be disclosed to the PTO or appropriately investigated. FF62.

The system disclosed in the '598 Patent (and embodied in the Footprint 1.0 CDN) is unquestionably relevant to patentability of the claims of the '703 Patent. Indeed, following a jury trial in this Court, the Federal Circuit held that the disclosure of the '598 Patent anticipated and rendered invalid Claims 1 and 3 of the '703 Patent. FF68. Because Dr. Leighton admitted that the subject matter of the '598 Patent discloses the Footprint 1.0 CDN as an embodiment (FF63, FF66), it is undeniable that information about the Footprint 1.0 CDN, is **per se** material.

Although the Federal Circuit has already established that the '598 Patent (and its disclosure of the Footprint 1.0 CDN) is material, Dr. Almeroth further demonstrated — in unchallenged testimony — the materiality of the subject matter disclosed in the '598 Patent.[5] For example, Dr. Almeroth's testimony showed that the '598 Patent discloses every element of Claim 15 of the '703 Patent. Exhibit C is a table summarizing Dr. Almeroth's conclusions regarding Claim 15. His conclusions concerning this claim were not challenged by Akamai on cross-examination or during the testimony of its expert. Because Dr. Leighton admitted that the Footprint 1.0 CDN was disclosed in the '598 Patent, Dr. Almeroth's analysis of the '598 Patent is equally applicable to the Footprint 1.0 CDN. FF63, FF70-76.

---

[5] The Farber PCT has the same disclosure as the '598 Patent, and thus the same analysis applies. FF58.

The '598 Patent and its embodiment describing the Footprint 1.0 CDN also disclose elements important to other claims of the '703 Patent.  For example, both Claims 1 and 14 of the '703 Patent include a limitation for prepending a CDN hostname to a content provider's domain name and path.  FF76.  That also appears in the '598 Patent (and the Footprint 1.0 CDN), which discloses prepending a repeater's hostname to the origin server's domain name and path.  FF76.

Claim 1 of the '703 Patent includes the limitation "a set of content servers, distinct from the content provider server, for hosting at least some of the embedded objects of web pages that are normally hosted by the content provider server."  FF70. This is commonly called "page splitting." The '598 Patent application, and its Footprint 1.0 CDN embodiment, earlier disclosed page splitting:  a set of repeaters that are distinct from the content provider, which host at least some of the embedded objects that would normally be hosted by the content provider.  FF70.

Claim 14 of the '703 Patent includes the limitation of "if the cached copy of the embedded object is not available from the content server, serving the embedded object from the content provider server."  FF76. This allows the CDN to retrieve an object from the origin server if the object is not found in the CDN. The '598 Patent, and its Footprint 1.0 CDN embodiment, earlier disclosed this retrieval of objects from the origin server when they are unavailable in the CDN.  FF76.  As with his conclusions regarding Claim 15, Dr. Almeroth's testimony regarding prepending, page splitting, and retrieving objects was unchallenged by Akamai.

Finally, Claim 17 of the '703 Patent includes the limitation "tagging an embedded object in a page to resolve to a domain other than a content provider domain by ***prepending given data*** to a content provider-supplied URL to generate an alternate resource locator (ARL)."  FF77. This limitation does not require what is prepended to be a "hostname"; it only requires that "given data" be prepended.  Hence, even if, as Dr. Leighton asserted (inaccurately) at the November trial the Footprint 1.0 CDN only prepended an IP address onto a URL, that understanding of the Footprint 1.0 CDN still included the prepending element of Claim 17. Thus, Dr. Leighton's admitted knowledge of the Footprint 1.0 CDN was indisputably material to the prosecution and imposed a duty on him to disclose it to the PTO.

### 3.   The Information Applicants Withheld About The Footprint 1.0 CDN Was Not Cumulative To Art Before The Examiner.

Akamai has not disputed that the Footprint 1.0 CDN was highly relevant prior art. Instead, struggling to excuse Applicants' failure to disclose, Akamai argues that the Footprint 1.0 CDN is cumulative of other references considered by the Examiner. However, the evidence during trial — and in particular the testimony of Akamai's own expert Dr. Jeffay — shows the Footprint 1.0 CDN is not cumulative because none of the references before the Examiner, either singularly or in combination, disclosed the critical features found in the Footprint 1.0 CDN.

Even under Akamai's inaccurate argument that the Footprint 1.0 CDN was cumulative, Kriegsman (U.S. Patent No. 5,991,809) **must be combined** with Kenner (U.S. Patent No. 6,003,030) to disclose all of the critical elements of the Footprint 1.0 CDN. FF80. And, where the references before the PTO must be combined to disclose the combination of elements found in the withheld reference (here, the Footprint 1.0 CDN), the withheld reference is not cumulative. Semiconductor Energy Lab. Co. v. Samsung Elecs. Co., 204 F.3d 1368, 1374 (Fed. Cir. 2000) ("A withheld reference may be highly material when it discloses a more complete combination of relevant features, even if those features are before the patent examiner in other references."). As shown below, Akamai has not identified a single reference considered by the Examiner that taught the relevant combination disclosed in the Footprint 1.0 CDN. Accordingly, the Footprint 1.0 CDN is not cumulative.

### a.   Akamai's Expert, Dr. Jeffay, Admitted That Kriegsman And Kenner Do Not Disclose Everything Of Relevance In The Footprint 1.0 CDN.

The testimony of Dr. Jeffay, Akamai's technical expert, established that the Footprint 1.0 CDN is not cumulative. *First*, Dr. Jeffay admitted that Kriegsman does not disclose prepending a hostname of the secondary server to the hostname and path of the primary server. Rather, Kriegsman discloses *fully replacing* the URL (i.e., the original hostname and path) of the primary server with a new hostname and path of the secondary server. FF82. This is materially different from the Footprint 1.0 CDN and the claims of the '703 Patent, which cover prepending a new hostname onto (i.e., not fully replacing) the existing hostname and path of the origin

server.  FF82.  Unlike in Kriegsman, the original URL is not fully replaced in the Footprint 1.0 CDN or the '703 Patent.

*Second*, Dr. Jeffay admitted that Kriegsman does not disclose a content delivery network with a secondary server that uses the original URL (including the original hostname) of the primary server to obtain an object from the primary server when it is not found in the CDN. Because Kriegsman is a mirrored system, where all data is at all locations, there is no need to provide an alternate location to go to in the event that data is not found at the chosen server. FF81.  This is very different from the non-mirrored system of the '703 Patent.  And like the '703 Patent, the Footprint 1.0 CDN (as described in the '598 Patent) uses the hostname of the origin server to obtain an object from the origin server when the object cannot be found in the CDN. FF81, FF83. Thus, the Footprint 1.0 CDN included critical components of the '703 Patent that were wholly missing from Kriegsman.

*Third*, Dr. Jeffay admitted that even under his theory, he had to combine Kriegsman and Kenner to match the disclosure in the '598 Patent.  FF80.  That admission makes Akamai's cumulative argument specious, because even under Dr. Jeffay's (erroneous) theory that everything in the Footprint 1.0 CDN is found by *combining* Kriegsman and Kenner, the Footprint 1.0 CDN is not cumulative because it contains everything in a *single* piece of prior art. Semiconductor Energy Lab., 204 F.3d at 1374.

Dr. Jeffay's admissions about Kenner further show that the Footprint 1.0 CDN is not cumulative.  Dr. Jeffay admitted that the "path name to the mirror files" disclosed in Kenner is the path used to get the file when it is on a mirrored server in the content delivery network. FF83.  Files on mirror servers (like the files in Kenner) are copies of content originating with the content provider, not the original content on the content provider server.  This is different from what the Footprint 1.0 CDN does and what is claimed in the '703 Patent.  After prepending in the Footprint 1.0 CDN and the '703 Patent, the original URL remains and points back to the content provider where the content originated, not to a *copy* of the content on the mirror servers as

disclosed in Kenner.  Dr. Leighton agreed:  he admitted that both the Footprint 1.0 CDN and the '703 Patent are different from mirroring systems (like those described in Kenner).  FF83.

In addition, Dr. Jeffay admitted that Kenner does not disclose prepending the repeater *hostname* onto the hostname and path of the origin server.  FF84.  Instead, Dr. Jeffay tried to equate a *company name* with a server's hostname.  Dr. Jeffay based his opinion about Kenner on the incorrect assumption that the company name of a content provider is always the same as the hostname of the content provider's origin server.  FF84-85.  Yet testimony in prior proceedings before this Court prove that a company name is not necessarily, or even usually, the same as the hostname of the company's servers.  FF85.  The Footprint 1.0 CDN and claims of the '703 Patent, by contrast, both involve prepending a content server hostname (not a company name) onto the domain name and path of the origin server.  FF81-84.

> **b.** **Applicants Distinguished Prior Art Before the Examiner In A Way They Could Not Distinguish The Footprint 1.0 CDN.**

Withheld information is also not cumulative if it would have overcome an argument that an applicant made to the PTO with respect to prior art that was disclosed.  <u>Monsanto Co. v. Bayer Bioscience N.V.</u>, 514 F.3d 1229, 1237-40 (Fed. Cir. 2008); <u>Purdue Pharm. L.P. v. Endo Pharm. Inc.</u>, 438 F.3d 1123, 1132 (Fed. Cir. 2006).  Once again, the Footprint 1.0 CDN passes this test and thus cannot be cumulative.

During prosecution, Applicants emphasized the importance of the prepending step in the '703 Patent.[6]  To overcome the prior art relied on by the Examiner, Applicants argued that unlike the claims of the '703 Patent, the references cited did not disclose prepending a hostname onto a domain name and path.  FF26-27, FF122.  For example, to overcome the Examiner's rejection based on Brendel, Applicants successfully argued that Brendel did not apply because it taught the "technique of 'appending' (not prepending) a virtual IP address to the end of a data packet."  FF26-27, FF122.  But the Footprint 1.0 CDN disclosed the very element that Applicants said was

---

[6]   This is highlighted by the title change ordered by the Examiner.  When he allowed the '703 Patent, he ordered that the title of the '703 Patent be changed to "Global Hosting System For Redirecting Request For Embedded Object By Prepending Host Name To URL Referencing The Object Prior To Serving A Web Page."  FF28.

lacking in Brendel: prepending a hostname onto a domain name and path. FF64, FF81-84.

Therefore, because the Footprint 1.0 CDN would have negated Applicants' argument that the

'703 Patent was new because it disclosed prepending a CDN hostname to the content provider's

domain name and path, the Footprint 1.0 CDN is not cumulative. Monsanto, 514 F.3d at 1237-

40 (reference is material, and thus not cumulative, if it negates arguments made by the applicants

during prosecution to distinguish or overcome prior art references cited by the examiner).

### B.     Applicants Intended To Deceive The PTO In Failing To Disclose Sandpiper And The Footprint 1.0 CDN.

Applicants, individually and working in concert, intentionally deceived the PTO by

withholding all information known to them about Sandpiper and the Footprint 1.0 CDN.

Inventors Dr. Leighton and Mr. Lewin, and their patent attorney Mr. Judson, knew about the

existence and operation of Sandpiper's Footprint 1.0 CDN, and knew (or at the very least should

have known) of the pending Farber applications. Their failure to disclose this information to the

PTO is all the more culpable in light of the high materiality of the Footprint 1.0 CDN and

Applicants' affirmative responsibility to appropriately investigate potentially material

information and to conduct a search as a condition of their Petition to Make Special.

A patent applicant's intent to deceive "need not, and rarely can, be proven by direct

evidence." Ferring B.V. v. Barr Labs., Inc., 437 F.3d 1181, 1191 (Fed. Cir. 2006). "Direct proof

of wrongful intent is rarely available but may be inferred from clear and convincing evidence of

the surrounding circumstances." LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n, 958

F.2d 1066, 1076 (Fed. Cir. 1992). Accordingly, intent to deceive is "most often proven by a

showing of acts, the natural consequences of which are presumably intended by the actor."

Molins PLC v. Textron, Inc., 48 F.3d 1172, 1180 (Fed. Cir. 1995).

In particular, intent to deceive may be inferred where a patent applicant knew or should

have known, that the PTO would consider withheld information material in determining

patentability. Monsanto, 514 F.3d at 1241. Similarly, intent to deceive can be found where

patent applicants disregard warnings that material information may exist in order to avoid actual

knowledge of that information. Brasseler, 267 F.3d at 1383. Conduct giving rise to an inference

of deceptive intent includes:  absence of a reasonable basis for failing to appropriately investigate publications or patents; failure of patent counsel to recall discussions probing potentially invalidating facts despite having direct contact with inventors; failure to explain what event prompted an expedited filing; assertion of the attorney-client privilege to withhold information regarding the prosecution of the patent-in-suit; and adverse credibility determinations by the Court.  Id. at 1377.  All of these are present here.

As discussed in greater detail below, Applicants' intent to deceive the PTO is shown by at least the following facts, proven by clear and convincing evidence during the trial:

• Applicants admit they were well aware of Sandpiper and the operation of its Footprint 1.0 CDN, Akamai's primary CDN competitor and one on which Akamai had prepared a detailed, 24-page Competitive Overview in September 1999 that included a discussion of the Footprint 1.0 CDN.  The existence of a pending patent application on the Footprint 1.0 CDN was also disclosed on Sandpiper's website, which Mr. Lewin admitted he reviewed "almost daily."  Yet Applicants failed to disclose any of that material information to the PTO.

• Despite Applicants' affirmative obligation to search for prior art as a condition to their Petition to Make Special, Mr. Judson did not use "Sandpiper" or "Footprint" as search terms, limiting his search to three-year old information about five companies working on mirroring rather than CDNs.  He also failed to search any databases with foreign information, which would have revealed the Farber PCT Application, even though he knew foreign prior art was relevant. And he could not recall discussions with the inventors about many aspects of the prosecution.

• Tellingly, Dr. Leighton and Mr. Judson each testified to the same excuse for not disclosing to the PTO any of the information they knew about Sandpiper and its Footprint 1.0 CDN to the PTO — they simply did not think about it.  This "excuse" is not credible given their extensive knowledge of the Footprint 1.0 CDN and their focused interest in Sandpiper as Akamai's most significant CDN competitor while the '703 Patent application was pending.

• Even were it true, Applicants' admitted failure to even consider disclosing this information constitutes a serious breach of their duty to determine the materiality of relevant

information known to them about the Footprint 1.0 CDN.  Akamai's own expert on PTO procedures testified that Applicants had a duty to investigate the materiality of known, potentially relevant information as part of their disclosure obligations.

• Based on the evidence presented at the trial, the only reasonable conclusion is that Applicants filed the Petition to Make Special to advance prosecution of the '703 Patent ahead of the pending Sandpiper application, about which there was public information as of September 1999.  After waiting more than ten months from their filing of a provisional patent application until they filed a non-provisional application, and then doing nothing to advance the prosecution for another four months after that, Applicants suddenly filed a Petition to Make Special six weeks after publication of the Farber PCT Application.  Despite this remarkable timing, Applicants refused to disclose a reason for their filing of the Petition, affirmatively asserting the attorney-client privilege to prevent inquiry into their reason. This justifies a negative inference about their reason, and further supports a finding of intent to deceive.

• The evidence also raises substantial questions about Applicants' credibility at trial.  For example, Dr. Leighton's testimony in this case contradicts his testimony in the Digital Island trial and positions Applicants themselves took before the PTO during prosecution of the '703 Patent in a number of critical respects.  Moreover, Mr. Judson either purposely did not keep any records of the search he conducted and his prosecution of the '703 Patent, or destroyed those records, because he provided no documents relating to the search and cannot explain what happened to them.  Finally, Dr. Leighton and Mr. Judson exhibited selective recollection of events during the prosecution — recalling certain points in detail during their direct examinations while claiming a lack of recollection of numerous fundamental points when on cross-examination.

### 1.    Applicants Intentionally Withheld Known Information About Sandpiper And The Footprint 1.0 CDN To Deceive The PTO.

As shown above in Section II.A.1, Applicants were well aware of Sandpiper and the existence of the Footprint 1.0 CDN at least as early as September 1998, eight months before they filed their non-provisional application in May 1999, and a full year before they filed their Petition to Make Special in September 1999.  Dr. Leighton, Mr. Lewin, and Mr. Judson all

admitted they knew about and discussed Sandpiper and the Footprint 1.0 CDN, and Dr. Leighton and Mr. Lewin in particular studied its operation, with (among other things) Akamai preparing a 24-page Competitive Overview in September 1999 that discussed Sandpiper and the Footprint 1.0 CDN in detail.  Mr. Lewin admitted that he monitored Sandpiper's website "almost daily," and Dr. Leighton discussed the technical operation of the Footprint 1.0 CDN with Akamai customers in the Spring of 1999.  FF46.

Despite their great familiarity with the Footprint 1.0 CDN and their intense interest in Sandpiper as a competitor, Applicants admit they never disclosed anything about Sandpiper or the Footprint 1.0 CDN to the PTO during prosecution of the '703 Patent, either before or after the Petition to Make Special.  FF30, FF88, FF91.  Applicants' failure to reveal Sandpiper and the Footprint 1.0 CDN to the PTO, information that was clearly material and in whole or in part invalidating of the claims in the application for the '703 Patent (see Section II.A.2 above), is in itself clear and convincing evidence of an intent to deceive the PTO.  Semiconductor, 204 F.3d at 1375 ("Proof of high materiality and that the applicant knew or should have known of that materiality makes it difficult to show good faith to overcome an inference of intent to mislead.").

When presented with nondisclosure of material information such as this, courts have had no trouble finding deceptive intent.  For example, in Brasseler, the Federal Circuit upheld a finding of deceptive intent where Brasseler's patent counsel failed to disclose the details of a possible on-sale bar event. Although no direct evidence established that patent counsel knew of an invalidating on-sale bar, the Federal Circuit held that the duty of disclosure required Brasseler's attorneys to disclose or investigate the facts surrounding the "potential on-sale bar" to determine its materiality.  Because the applicants had notice that specific information existed that *may* have been material to the patentability of the application, but chose not to disclose or investigate those facts, the Federal Circuit found deceptive intent.  Brasseler, 267 F.3d at 1381-85.  Similarly, the district court in Rothman v. Target Corp. recently held a patent unenforceable for inequitable conduct for, *inter alia*, the applicant's failure to disclose or investigate the

similarity of a competitor's known product and whether that competitor was the first to invent. Rothman v. Target Corp., Case No. 054829, 2008 WL 1995129, at *7-9 (D.N.J. May 6, 2008).

Applicants likewise ignored material information about Sandpiper and the Footprint 1.0 CDN they knew of during prosecution of the '703 Patent.  That, by itself, is sufficient to prove deceptive intent, although as shown below much more evidence supports the same conclusion.[7]

### 2. Applicants' Failure To Search For "Sandpiper" Or "Footprint" In Connection With Their Petition To Make Special Is Further Evidence Of Intent To Deceive.

Applicants further demonstrated their intent to deceive in connection with their filing of the Petition to Make Special.  Although Limelight is not required to show that Applicants actually gained an advantage by virtue of their failure to disclose, the failure to search for (or disclose) Sandpiper and the Footprint 1.0 CDN in connection with the Petition to Make Special gave them such an improper advantage.

The application for the Farber '598 Patent was filed on February 10, 1998, more than fifteen months before Applicants filed their non-provisional application relating to the '703 Patent.  In the normal course of events, the application for the '598 Patent would have proceeded through the PTO and issued long before the '703 Patent.[8]  Under that sequence of events, the '598 Patent would have been recognized by the PTO as prior art while the '703 Patent was still in prosecution.  This would have had a significant if not fatal impact on the '703 Patent — for one thing, we know from the Federal Circuit decision that the '598 Patent invalidates at least Claims 1 and 3 of the '703 Patent.

---

[7]   Moreover, while the overall evidence of intent to deceive in this case is multifaceted and strong, the fact that the information about Sandpiper and the Footprint 1.0 CDN that was withheld was highly and plainly material (see discussion in Section II.A.2, above) causes inequitable conduct to arise even with less culpable intent.  See, e.g., GFI, Inc., 265 F.3d at 1273 ("The more material the omission, the less culpable the intent required, and vice versa."); Brasseler, 267 F.3d at 1381 ("When balanced against high materiality, the showing of intent can be proportionally less.").

[8]   Non-provisional patent applications are taken up for examination by the examiner in the order in which the applications have been filed. "Each examiner will give priority to that application in his or her docket, whether amended or new, which has the *oldest effective U.S. filing date*." Manual of Patent Examining Procedure § 708 (Seventh Ed. 1998) (emphasis in original).  Where co-pending patent applications of different inventors claim similar subject matter, the PTO may consider an interference if appropriate, and suspend the later filed application until the earlier filed application issues as a patent and then reject the later filed application under 35 U.S.C. 102(e) or 103. Manual of Patent Examining Procedure 706.02(l)(III).  FF97.

However, even though they had substantial knowledge of the Footprint 1.0 CDN, including that Sandpiper announced that it had a "patent pending,"  Applicants (1) failed to bring this information to the attention of the PTO, (2) failed (according to their testimony) to make the appropriate investigation as to materiality, and (3) took affirmative steps to accelerate the prosecution of the '703 Patent immediately after the Farber PCT Application became public, which caused their '703 Patent to issue before the earlier-filed '598 Patent could be cited as prior art.  As a condition of seeking the acceleration via the Petition to Make Special, Applicants had the affirmative obligation to make a pre-examination search, "submit one copy each of the references deemed most closely related to the subject matter encompassed by the claims if said references are not already of record," and "submit a detailed discussion of the references, which discussion points out, with the particularity required by 37 C.F.R. 1.111 (b) and (c), how the claimed subject matter is patentable over the references."  MPEP § 708.02(VIII); see also FF15 (Kunin testimony on applicability of MPEP § 708.02(VIII)).

Mr. Judson's testimony revealed many failings in the search he made:

• He limited his search for assignees of relevant prior art to only five companies that appeared years earlier in the 50K business competition at MIT.  These five companies were all trying to solve problems with mirroring, which Mr. Judson knew was not at issue in the '703 Patent.  FF107.

• He did not search for any information regarding Sandpiper or Footprint, even though he (and Dr. Leighton and Mr. Lewin) knew of and discussed Sandpiper and the Footprint 1.0 CDN at the time (FF33-46, FF48, FF109).  It is undisputed that Sandpiper was Akamai's most significant competitor.  FF53.

• He did not search for foreign patents or applications, even though he knew they could be just as relevant as U.S. prior art.  FF108.

• He has little recollection, and no records, of the search he performed or its results. FF113, FF166.

• He says he cannot recall what if anything he did to determine whether or not Mr. Lewin had knowledge of material prior art, and claims not to recall what he discussed (or when) with Dr. Leighton about material prior art, during the prosecution of the '703 Patent.  FF165.

Additionally, Mr. Judson claims he did not discover the Farber PCT Application until after the '703 Patent issued, when he supposedly first ran a search for Sandpiper patents or applications.  But there are only two rational possibilities to explain this timing — either Mr. Judson (and/or Dr. Leighton and/or Mr. Lewin) found the Farber PCT Application, which sparked their rush to get the Petition to Make Special on file, *or* they studiously avoided learning about the Farber PCT Application by conducting an unreasonably narrow and insufficient search that disregarded known information about Sandpiper and the Footprint 1.0 CDN.  Either way, Applicants breached their duty to the PTO, especially in light of the requirements of the Petition and their obligation to investigate the materiality of information known to them.  GFI, Inc. v. Franklin Corp., 88 F. Supp.2d 619, 632 n.17 (N.D. Miss. 2000), *aff'd*, 265 F.3d 1268 (Fed. Cir. 2001) (particular scrutiny of intent may occur in the context of a Petition to Make Special).

The timing of Applicants' Petition to Make Special is suspicious, and unexplained.  It was filed on September 24, 1999, *six weeks after the Farber PCT Application relating to the Footprint 1.0 CDN was published (August 12, 1999)*.  Before then, Applicants were in no hurry to advance the prosecution of the '703 Patent — they filed the provisional patent in July 1998 and then the non-provisional patent application ten months later in May 1999, and took no other steps to move the prosecution of that application along.  FF12, FF95.  However, within six weeks after the Farber PCT Application was published — and more than 14 months after Applicants had filed their provisional application — they suddenly exhibited an extreme urgency to expedite the prosecution of the '703 Patent. They took an unusual step — filing a Petition to Make Special.  FF15.  Applicants' refusal to explain the reason for this unusual filing justifies a negative inference and supports a finding of intent to deceive.  See, e.g., Brasseler, 267 F.3d at 1377 ("The court noted with great skepticism that Brasseler even failed to provide evidence

explaining who at Brasseler contacted [patent attorney] Price and what event prompted the rushed filing of the application.").

The timing of Applicants' actions would be telling even had they tried to offer some explanation for their sudden decision to expedite the prosecution by filing a Petition to Make Special.  But Akamai went further and affirmatively prevented any inquiry into this timing, instead of being forthcoming and subjecting their actions to cross-examination.  FF16, FF99.  To be sure, Akamai has every right to assert a privilege.  But a party reversing course after 14 months of inactivity — just after a damaging patent application was published — would have nothing to hide if acting in good faith.  The fact that Applicants have offered no reason for the Petition to Make Special, and have invoked the attorney-client privilege to preclude any examination as to such reason, justifies a negative inference as to their true reason, and supports finding an intent to deceive the PTO as the explanation for withholding material information from the PTO.  Brasseler, 267 F.3d at 1377 ("The court was further influenced by Brasseler's decision not to obtain any testimony from Price showing that he had a reasonable basis for failing to direct or make such an inquiry and its invocation of the attorney-client privilege to protect documents generated by Brody in the course of prosecuting the application.").[9]

### 3. Applicants' Failure To Appropriately Investigate Known Information Further Evidences Their Intent To Deceive The PTO.

When patent applicants have notice that specific information exists that may be material to the patentability of their application, they must investigate the materiality of that information to comply with their duty to disclose.  Brasseler, 267 F.3d at 1382.  Recognizing the potential for abuse, the Federal Circuit has specifically cautioned that "one should not be able to cultivate ignorance, or disregard numerous warnings that material information or prior art may exist,

---

[9]  While the Farber PCT Application was not prior art itself, the published application revealed on its face the pending application for the U.S. Farber Patent and its February 10, 1998 filing date.  Had this information been given to the Examiner at any time during the prosecution of the '703 Patent, the Examiner could have, and should have, denied the expedited treatment of the '703 Patent application and enabled the first-filed '598 Patent to issue before the '703 Patent, thus making the '598 Patent prior art to the '703 Patent *during* the prosecution of the '703 Patent.  FF57.  Given the fact that the '598 Patent invalidates at least claims 1 and 3 of the '703 Patent, this would have had a significant impact on the prosecution of the '703 Patent.

merely to avoid actual knowledge of that information or prior art." Brasseler, 267 F.3d at 1383 (citing FMC Corp. v. Hennessy Indus., Inc., 836 F.2d 521, 526 n.6 (Fed. Cir. 1987)).

Because (1) Applicants knew about the Footprint 1.0 CDN during prosecution of the '703 Patent, (2) the Footprint 1.0 CDN and the associated Farber applications were highly material to the prosecution of the '703 Patent, and (3) Applicants failed to disclose this information to the PTO, Applicants cannot avoid an inference that their conduct was intentionally misleading.

In a misguided attempt to show good faith, both Dr. Leighton and Mr. Judson resort to the same excuse, which essentially boils down to "Sorry, but I didn't think about it at the time."

Specifically, Dr. Leighton testified:

Q:  Now, did you disclose to the PTO the initial Sandpiper system?

A:  No.

Q:  Why not?

A:  It didn't occur to me to do so.

FF88, FF119.  Similarly, Mr. Judson testified that, although he knew about the Footprint 1.0 CDN, "it wasn't what we were trying to claim, and to the extent that it wasn't frankly on my radar screen at all as prior art."  FF90.  Mr. Judson's explanation, however, is not only incredible, it makes no sense.  The fact that a reference does not cover what a patentee is trying to claim does not make it irrelevant for disclosure purposes.  If the rule were otherwise, a patentee would never have to disclose anything, since patentees are necessarily trying to claim inventions ***not*** in the prior art.

In any event, Dr. Leighton's and Mr. Judson's professed lack of thought about Sandpiper and the Footprint 1.0 CDN does not excuse their failure to investigate the materiality of information known to them.  See, e.g., Bristol- Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc., 326 F.3d 1226, 1233 (Fed. Cir. 2003) ("where withheld information is material and the patentee knew or should have know of that materiality, he or she can expect to have great difficulty in establishing subjective good faith sufficient to overcome an inference of intent to mislead").  Indeed, Akamai's own expert, Mr. Kunin, agreed that "when an individual having a duty of

disclosure is aware of information, there's an obligation to evaluate that information as to whether it would be material to the patentability of at least one claim of a pending application." FF62.  If simply not thinking to disclose Sandpiper and the Footprint 1.0 CDN could establish a valid excuse, virtually any applicant could avoid a finding of inequitable conduct by claiming, during litigation, that he did not consider disclosing material information in his possession.  That is not the law.  See, e.g., Brasseler, 267 F.3d at 1381-83 (when inventors blame their failure to disclose on ignorance of the law, or patent counsel blame their failure to appropriately investigate on ignorance of the facts, deceptive intent may be inferred).

Moreover, Applicants cannot defend their failure to disclose or investigate the materiality of Sandpiper or the Footprint 1.0 CDN in connection with the Petition to Make Special based upon their disclosure of the Kriegsman Patent.  Apart from their being wrong about Kriegsman being cumulative (see discussion in Section II.A.3, above), Applicants did not disclose Kriegsman to the PTO until January 2000, which is after the PTO had already granted the Petition to Make Special.  FF92.  Thus, Kriegsman can in no way be used to excuse Applicants' failure to disclose the known information about Sandpiper and the Footprint 1.0 CDN at the time Applicants filed their Petition to Make Special.

Even under the most charitable view of the knowledge of Dr. Leighton, Mr. Lewin, and Mr. Judson, all three of them knew before the filing of the Petition to Make Special that the Footprint 1.0 CDN was at least a potentially relevant system that required appropriate investigation in order to determine whether it or other related information — such as the Farber PCT Application or pending '598 Patent application identified on the face of the Farber PCT Application — should be looked for and disclosed.  Brasseler, 267 F.3d at 1385 ("Attorneys must conduct meaningful inquiries when the surrounding factual circumstances would cause a reasonable attorney to understand that relevant and questionable material information should be assessed.").  By failing to undertake this inquiry — especially in the face of a Petition to Make Special that heightened the obligation to investigate materiality — Applicants breached their duty and misled the PTO in connection with the prosecution of the '703 Patent.  Id. at 1383 ("the

court found that Price and Brody's 'studied refusal to timely investigate' and disclose material information, under a continuing duty to disclose, established that Price and Brody acted with deceptive intent. We see no error in the district court's determination").

### 4. Applicants' Lack Of Credibility Further Supports The Conclusion That They Intended To Deceive The PTO.

Applicants exhibited a lack of credibility in many of their statements at trial, further supporting the conclusion that Applicants intended to deceive the PTO.  See, e.g., Brasseler, 267 F.3d at 1384-85.

To start, Sandpiper was Akamai's main CDN competitor during the relevant period.  Dr. Leighton studied it; Akamai prepared a Competitive Overview addressing Sandpiper's Footprint 1.0 and Footprint 2.0 CDNs; Dr. Leighton discussed the Footprint 1.0 CDN with Akamai's customers; Mr. Lewin monitored the Sandpiper website "almost daily"; and Mr. Judson admitted that he knew how the Footprint 1.0 CDN worked by September 1999.  It is not credible that Applicants did not even consider disclosing Sandpiper or the Footprint 1.0 CDN to the PTO.

Furthermore, Dr. Leighton was unable to recall any specifics regarding the Petition to Make Special or the prosecution of the '703 Patent, yet he also attempted to give detailed testimony about disclosure of certain prior art references and offered extensive, post-hoc explanations about what might have been done.  FF120.  Similarly, Dr. Leighton could not remember how or when he found out about the Farber PCT Application, yet he was certain that he had not become aware of the Farber PCT Application until after the issuance of the '703 Patent.  FF120.  Such selective memory is inconsistent with credible and forthright testimony.

Dr. Leighton's contention that the Footprint 1.0 CDN did not use hostnames to identify repeaters was also not credible and was contradicted at trial.  FF121.  In fact, in the Digital Island trial Dr. Leighton testified that the Footprint 1.0 CDN could use hostnames (or IP addresses) to identify repeaters.  FF121.

Finally, Dr. Leighton's trial testimony regarding the Brendel prior art reference contradicts what Applicants represented to the PTO.  At trial, Dr. Leighton claimed that Brendel discloses prepending; that is, "putting an IP address in front of a link."  FF122.  However, during

-24-

the prosecution of the '703 Patent, Applicants represented to the PTO that the '703 Patent was patentable over Brendel because Brendel did ***not*** prepend.  Instead, Applicants argued that Brendel disclosed "'appending' (not prepending) a virtual IP address to the end of a data packet," and as a result Brendel was very different from the prepending of the '703 Patent.  FF122.

Mr. Judson also tried a number of times to rewrite history as opposed to reporting his actual recollection, testifying, for example, "My best reconstruction of what happened is that to the extent I was thinking about Sandpiper or Footprint at all in this time frame, it was in the context of the commercial problem that my client had raised; namely, the issue of copying of the Akamai commercial system."  FF90.  Mr. Judson's attempt to "reconstruct" what happened is improper and insufficient. "Hindsight construction of reasons why a reference might have been withheld cannot suffice as a credible explanation of why, at the time, the reference was not submitted to the PTO."  Praxair, Inc. v. ATMI, Inc., 543 F.3d 1306, 1318 (Fed. Cir. 2008).  Mr. Judson's "reconstruction" is also substantially undercut by his inability to recall basic facts about the prosecution, such as the time or substance of any communications with Dr. Leighton or Mr. Lewin concerning prior art.  FF163-65.

Moreover, the fact that Mr. Judson claimed to have no records regarding the Petition to Make Special — and had no idea what happened to his records — also reflects adversely on his credibility in this matter, especially since Akamai is his largest client and he has been Akamai's counsel continuously since the prosecution of the '703 Patent.  FF113, FF166.

*    *    *

In sum, the clear and convincing evidence in this case shows that:

• Applicants had detailed knowledge of Sandpiper and the Footprint 1.0 CDN and intentionally failed to disclose that information in order to mislead the PTO;

• After failing to prosecute their provisional application for ten months and then their non-provisional application for four more months, Applicants suddenly (and immediately following publication of the Farber PCT Application) sought to advance their application by filing a Petition to Make Special without conducting a proper search for relevant information

relating to Sandpiper or the Footprint 1.0 CDN and by falsely suggesting that the most relevant art would come from five companies focusing on mirroring issues;

• Applicants cannot identify any reason for failing to disclose Sandpiper and the Footprint 1.0 CDN to the PTO or to use "Sandpiper" or "Footprint" as search terms or to otherwise follow up on the material information they had, other than their incredible and legally insufficient claim that they did not think to do so;

• Applicants have not identified any reason for their filing of the Petition to Make Special and instead have blocked all inquiry into this issue by their assertion of the attorney-client privilege; and

• Applicants' testimony concerning prosecution of the '703 Patent lacks credibility, and they have been unable to produce any documents concerning the Petition to Make Special or the related prior art searches.

For all of these reasons, the clear and convincing evidence shows Applicants withheld material information with an intent to mislead the PTO during prosecution of the '703 Patent.

## III.   AKAMAI'S CLAIMS ARE PRECLUDED BY EQUITABLE ESTOPPEL, LACHES, AND UNCLEAN HANDS.

### A.   Akamai Is Equitably Estopped From Obtaining Any Relief.

Equitable estoppel precludes a patent infringement claim when the plaintiff's representations or conduct cause an accused infringer to believe that the plaintiff will not assert or has abandoned a claim. See, e.g., Studiengesellschaft Kohle mbH v. Eastman Kodak Co., 616 F.2d 1315, 1325 (5th Cir. 1980). A plaintiff is equitably estopped when (1) the plaintiff communicated "something in a misleading way, either by words, conduct or silence," (2) the defendant relied on the misleading communication, and (3) the defendant would be materially harmed if the patentee is "later permitted to assert any claim inconsistent with its earlier conduct." A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1041 (Fed. Cir. 1992). The defendant bears the burden of proving these facts by a preponderance of the evidence. Id. at 1046. There is no requirement that the defendant have stopped the accused conduct in order to prevail on a defense of equitable estoppel. Id. at 1041.

Here, Akamai should be equitably estopped from pursuing its infringement allegations against Limelight.  During and following acquisition talks in 2004 — in which Limelight revealed detailed technical and business data — Akamai sent Limelight a clear message that the companies could peacefully and successfully co-exist in the CDN marketplace.  Thereafter, Limelight relied on Akamai's conduct and communications and expanded the company's CDN business in the belief that Akamai would not challenge that business with an infringement action.  Only much later — in mid-2006 — did Limelight learn it had been gravely misled.

        1.       **Akamai Misled Limelight And Caused It To Believe That Akamai Would Not Sue Limelight For Patent Infringement.**

Over the course of numerous meetings and discussions in 2004, followed by a period of silence in 2005 through the Spring of 2006, Akamai engaged in a course of conduct that affirmatively misled Limelight into believing that Akamai had no intention of asserting its patents against Limelight, even while Akamai was actively preparing to file this suit.  The first element of equitable estoppel — that Akamai misled Limelight — is shown by (1) Akamai expressly encouraging Limelight to grow its CDN business after Limelight had provided substantial details about that business to Akamai, all while touting its patent claims against others but giving Limelight no indication of any patent concerns, and (2) Limelight's reasonable belief, in light of Akamai's conduct and communications, that Akamai did not view anything Limelight was doing as infringing and would not accuse Limelight of infringement.

        a.       **During The 2004 Acquisition Discussions, Akamai Learned Of Business And Technical Information About Limelight's CDN.**

Beginning in April 2004, Akamai and Limelight engaged in a lengthy series of communications aimed at Akamai potentially acquiring Limelight.  These discussions involved Robert Wood and Jeremy Segal of Akamai's corporate development group, and included both technical and financial due diligence of Limelight's CDN business.  FF132.  Akamai's knowledge of Limelight's CDN activities as of June 15, 2004 is reflected in an internal Akamai report called "Project Diamondback," which recognizes Limelight as a significant CDN

provider, recounts the status of Akamai's review of Limelight's CDN architecture, and reports on Limelight's customers and its revenue streams.  FF133.

The next day, on June 16, 2004, Limelight and Akamai executives met at Akamai's offices in Cambridge as part of the due diligence process.  With Akamai technical specialists present, the parties reviewed various aspects of Limelight's CDN and its CDN business, including information about how Limelight content servers were identified.  FF134.  In August 2004, the parties continued their due diligence communications and even examined the possibility of migrating Limelight customers to Akamai's CDN if Limelight was acquired, because (according to Akamai's Mr. Wood) of the differences between the parties' CDN architectures.  FF136.

During the 2004 discussions with Limelight, Akamai described its patent litigation with other CDNs, and the fact that Akamai "had an IP portfolio they were interested in enforcing," but never suggested there was a patent problem with Limelight's CDN.  FF135.  In the Fall of that year, Akamai decided not to proceed with the proposed deal.  At the end of acquisition talks, Akamai encouraged Limelight and wished it well in the future.  Specifically, Robert Wood of Akamai sent an email to Bill Rinehart, President of Limelight, on October 26, 2004, in which Mr. Wood congratulated Limelight on the great business Mr. Rinehart and his team had built. Mr. Wood expressly stated he was "glad to hear" about the "tremendous value" Limelight was going to receive for its business.  FF138.

After Akamai decided not to proceed with an acquisition of Limelight in 2004, Limelight continued to promote its growing CDN business to the public and potential customers.  For example, Mr. Gordon spoke at many Internet conferences, which often included other panelists from Akamai.  FF140.  Limelight also publicized its commercial successes in 2004, including delivery of Super Bowl commercials for iFilm.  FF140.  Growing its CDN business through 2005, Limelight gained Microsoft, MySpace, and Facebook as major customers. FF141.

Based upon Limelight's due diligence disclosures in 2004, and public information about Limelight's business successes, Akamai had gained an in-depth understanding of Limelight's

CDN technology and business by the time acquisition talks broke off.  Indeed, it would be

contrary to common sense and basic business practices for Akamai, a highly sophisticated multi-

national company, to conduct and complete due diligence on Limelight without understanding

Limelight's main asset, the Limelight CDN.  On the contrary, the Akamai "Project

Diamondback" document, created in the middle of the due diligence process, confirms that

Akamai took great care and interest in reviewing and understanding Limelight's CDN

architecture and business.  FF133, FF148.

> **b.**   **Akamai's Misleading Conduct And Communications —
> During And After The 2004 Acquisition Talks — Caused
> Limelight To Believe Akamai Would Not Sue For Patent
> Infringement.**

Limelight learned of Akamai's '703 Patent in 2003 when Michael Gordon read published

reports about the litigation between Akamai and Digital Island (then Cable & Wireless).  Mr.

Gordon also read the Federal Circuit's decision in the appeal of that case and related press

reports.  FF131.  During the acquisition discussions in 2004, Limelight revealed technical and

business data regarding Limelight's CDN on a level of detail required as due diligence in a

potential multi-million dollar acquisition.  At the same time, Mr. Wood conveyed Akamai's

strategy of asserting its patents against alleged CDN infringers (including Speedera), yet never

mentioned or even intimated that Limelight might be a target of such a case.  FF135.

Akamai did not just remain silent about any potential infringement, it actively

encouraged Limelight in its business and wished Limelight well when acquisition talks ended in

October 2004.  Akamai's silence about a potential patent infringement, coupled with its

encouragement to Limelight while engaged in business discussions, was misleading conduct that

created an equitable estoppel.  See, e.g., Giese v. Pierce Chem. Co., 29 F. Supp.2d 33, 42 (D.

Mass. 1998) (misleading communication sufficient to establish equitable estoppel may be

nothing more than misleading inaction combined with other facts with respect to the relationship

or contacts between the parties that gives rise to the inference that any claims against the

defendant are abandoned); Raber v. Pittway Corp., Case No. C922581, 1994 WL 374542, at *5

(N.D. Cal. July 11, 1994) (silence in the face of a competitive relationship between the parties,

the parties' awareness of each other's products, and frequent meetings between the parties supports a finding of the first element of equitable estoppel).

It would be manifestly inequitable for Akamai to actively encourage Limelight's activities, while never revealing that Akamai thought those activities were infringing, and then take advantage of the results of that encouragement by filing suit and seeking damages for the very activities it encouraged.  Akamai had numerous opportunities in 2004-2006 to inform Limelight that Akamai believed Limelight was infringing the '703 Patent, and that Akamai was actually preparing to file an infringement suit.  In particular, Akamai could have and should have revealed its true intent in all of the following instances:

- During discussions and meetings related to potential acquisition in 2004, Akamai and Limelight discussed Akamai's patent litigation against other CDN providers and Akamai's aggressive assertion of its patent portfolio, yet Akamai never raised the possibility that Limelight might infringe an Akamai patent.  FF135, FF139.

- At no point during the 2004 acquisition talks was potential patent infringement by Limelight raised as a factor to lower an acquisition price or incentivize completion of the deal. FF132, FF134, FF139.

- Akamai encouraged Limelight to continue the very activity it later charged with infringement, such as in an October 26, 2004, Robert Wood email to Bill Rinehart, President of Limelight, in which Mr. Wood congratulated Limelight on the great business Mr. Rinehart and his team had built.  Mr. Wood also stated he was "glad to hear" about the "tremendous value" Limelight was going to receive for its business.  Mr. Wood testified that he was sincere in giving this cordial sign off to the acquisition discussions.  FF138.

- Throughout 2004 and 2005 and continuing until Akamai filed the present lawsuit in June 2006, Akamai never even intimated that Limelight infringed the '703 Patent despite Limelight's continuing publicity, successes, and public discussion of its CDN (often in the presence of Akamai employees), and indeed, another round of acquisition talks starting in January 2006.  FF140, FF142, FF146-47.

Akamai knew that a company such as Limelight, engaged in purchase negotiations with a sophisticated company such as Akamai, would reasonably believe the acquiring company would leverage any patents it had to drive down the purchase price.  Akamai itself admits that these infringement considerations were weighed and investigated as part of the later acquisition due diligence in 2006.  FF145.  And, even if Akamai did not investigate potential patent infringement during the 2004 acquisition talks as Mr. Wood claimed, Limelight still reasonably believed Akamai would come forward with such an assertion if in fact it believed there was potential infringement by Limelight.  Moreover, in 2004, Akamai affirmatively represented to Limelight that the companies' respective CDNs had significant differences in their architecture and encouraged Limelight going forward after the acquisition talks ended.  FF136-38.

Thus, by the end of 2004, based on Akamai's conduct and communications, Limelight understood that (1) Akamai not only intended to, but did assert its patents against certain CDN competitors, (2) Limelight and Akamai were CDN competitors, (3) Akamai had detailed technical and business knowledge about Limelight's CDN, (4) Akamai affirmatively represented that the respective companies' CDN architectures had significant differences, and (5) Akamai had congratulated Limelight on its business and wished it well for the future.  Not surprisingly, Akamai's conduct and communications convinced Limelight that Akamai had no infringement claim and would not assert a potential infringement claim against Limelight. FF49-53, FF132-51.

Akamai's misleading actions about any alleged infringement is the type of misleading conduct from which courts find equitable estoppel.  For example, in Raber 1994 WL 374542, at *5, the plaintiff was a competitor of the defendant in the fire protection business.  Both parties knew of the other's products, and representatives from both organizations would frequently meet at industry trade shows.  Under these circumstances, it was reasonable for the defendant to expect that if the plaintiff owned a valid, enforceable patent covering one of the defendant's products, the plaintiff would attempt to enforce it.  This expectation was further supported by the competitors' correspondence indicating the patentee's disinterest in enforcing his patent against the defendant, which was further supported by subsequent years of inaction.  The plaintiff's

acquiescence to the defendant's alleged infringement prompted the defendant's business decisions to invest and step-up sales of the infringing device when a noninfringing alternative was available.  Id. at *5-6.

Similar to Raber, Akamai had business discussions with Limelight, knew Limelight's CDN in detail, mentioned asserting its patents against other competitors but never against Limelight, was silent for years about any potential patent claim against Limelight, and even congratulated and wished Limelight well in its business.  Akamai's conduct and communications created an estoppel against Akamai claiming infringement by Limelight's CDN.

### 2. Limelight Reasonably Relied On Akamai's Misleading Conduct And Communications By Investing In And Expanding Its CDN Business.

Limelight relied on Akamai's conduct and communications by expanding and investing in its CDN business.  From 2004 through mid-2006, Limelight made increasing investments in equipment for its CDN business and related sales and marketing activities.  FF154.  Limelight grew exponentially from a few servers in 2001 to a multi-million dollar global network with corresponding sales and marketing investments.  FF155-57.  If Akamai had timely filed claims or informed Limelight of potential infringement in 2002, 2003, 2004, or even early 2005, Limelight would likely not have focused solely on expanding its CDN business or locked itself into its current CDN business strategy. FF158.

By the time Akamai filed suit in June 2006, however, Limelight was committed to the CDN business with contractual obligations to hundreds of vendors and customers.  Limelight likewise had obligations to the many employees it hired and trained to support its growing business in reliance on Akamai's misleading conduct and communications.  FF158-59.  Limelight's investment of tens of millions of dollars in hardware, employees, marketing, training, sales, and technology was based on its reasonable belief from its dealings with Akamai that Limelight was free to expand its CDN business without the risk of a patent infringement suit by Akamai.

Limelight's financial investments and expansion of its CDN business in these circumstances is precisely the type of reliance that supports equitable estoppel.  See, e.g., Raber,

1994 WL 374542, at *5 (continued investment and increased sales of an infringing device in light of a patentee's inaction after frequent meetings between company representatives, when a non-infringing alternative is available, can demonstrate reliance).

> **3.      Limelight Will Be Materially Harmed If Akamai Is Allowed To Enforce The Jury Verdict Despite Its Misleading Conduct And Communications.**

There can be no question that Limelight would suffer substantial harm if Akamai were allowed to disavow its prior conduct and communications in order to enforce the jury verdict. By the time Akamai filed this lawsuit, Limelight had built a $100 million business based in part on its belief that there was no risk of a patent infringement claim from Akamai and had entered into contractual commitments with customers and suppliers who continue to rely on Limelight to this day. At this point of no return, it was impossible for Limelight to leave the CDN business. FF159.  If Akamai were permitted to recover on its infringement claims, Limelight would not only be at risk for payment of a substantial damages award, but would also be threatened by further loss of customers and business from the impact of a patent infringement judgment against its core business area.

By estopping Akamai and holding it to the consequences of its misleading conduct and communications, the Court would prevent unfair injury to Limelight and unfair gain by Akamai. These two companies should be allowed to continue their business plans, contracts, and obligations that Akamai knew of, encouraged, and did nothing to challenge for years.

> **B.      Akamai Is Barred By Laches From Obtaining Damages Before June 2006.**

Laches is established when a defendant shows that (1) "the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant" and (2) "the delay operated to the prejudice or injury of the defendant." A.C. Aukerman., 960 F.2d at 1032.  When proven, the defense of laches bars a claim for damages prior to suit. Id. at 1028-29.

Since at least October 2001, Akamai was well aware of Limelight's CDN and its CDN business.  Akamai's delay from 2001 to 2006 was unreasonable and establishes laches, barring any monetary recovery for the period before this lawsuit.

### 1.    Akamai Knew Of Limelight's CDN Since October 2001.

The period of delay for laches begins when the patentee has actual or constructive knowledge of the defendant's potentially infringing activities.  Wanlass v. Gen. Elec. Co., 148 F.3d 1334, 1337-38 (Fed. Cir. 1998).  The fact that delay can be based on constructive knowledge of the alleged infringer's activities imposes on patentees the duty to police their rights.  "[T]he law is well settled that where the question of laches is in issue the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry."  Wanlass, 148 F.3d at 1338.

Here, Akamai knew of Limelight's CDN business since at least October 2001 and referred to it in a number of internal communications beginning at that time, including documents that reflect Akamai's study and research of the Limelight CDN and knowledge of Limelight as a CDN competitor in 2001, 2002 and 2003.  FF125.  Limelight provided CDN services at quality and price points sufficient to compete for, and in many cases win, business from Akamai's customers.  For example, in December 2001, MusicMatch, previously an exclusive customer of Akamai for CDN services, decided to use Limelight's CDN services. FF126.  Limelight publicly announced this success, which was known by Akamai and discussed in an internal communication to Akamai's president, Mr. Sagan.  FF126.

Limelight's presence and strength as a player in the CDN marketplace continued to grow in the following years.  In 2002, Limelight expanded its customer base, becoming the exclusive provider of CDN services to MusicMatch and adding other customers including Radio Free Virgin.  FF128.  Indeed, as of April 2002, Akamai saw Limelight as a sufficient threat in the CDN market that it created a tactical document for its sales force entitled "How To Beat Limelight Networks."  FF125.  In 2003, Limelight continued to add major customers, including

the Rhapsody music service and the New Jersey Devils hockey team.  FF129.  By October 2003, Akamai referred to Limelight as "a key competitor in several accounts.  We are competing with them at MusicMatch, iFilms, Broadcast Electronics, Entriq and others.  We have lost to them at ABC Radio Networks.  They have a very strong presence in internet radio."  FF125.  And Limelight continued to publicize its CDN business and its business successes through a series of press releases.  FF127.

As a CDN competitor, Akamai not only knew about Limelight since 2001, but reasonably should have known of any alleged claim against Limelight that it might wish to assert. During acquisition discussions in 2004, Mr. Wood told Limelight that Akamai "had an IP portfolio that [it was] very interested in enforcing."  FF135. In 2006, Mr. Wood also told Limelight that anyone operating a CDN like Limelight had to come through Akamai's patent portfolio.  FF145. Accordingly, by Akamai's own admissions, it thought most CDN providers like Limelight had the potential to infringe Akamai patents.  Indeed, when Akamai finally got around to suing Limelight, its initial infringement contentions and its discovery requests covered the CDN system used by Limelight all the way back to its early days in 2001 and 2002.  FF161

### 2.    Akamai's Delay From 2001 To 2006 Was Unreasonable.

Whether a delay is unreasonable is not limited to a particular length of time; it is dictated by the particular circumstances.  Wafer Shave, Inc. v. Gillette Co., 857 F. Supp. 112, 128 (D. Mass. 1993) ("the length of delay in filing suit is not alone dispositive of the question of whether the delay was reasonable.  The patentee's conduct also affects the reasonableness of the delay."). The period of delay begins as soon as the patentee has actual or constructive knowledge of the defendant's potentially infringing activities.  Wanless, 148 F.3d at 1337-38.  Thus, patent owners have a duty to watch competitive companies and determine in a reasonable time whether to enforce their patent rights.  Id. at 1338 ("[S]ales, marketing, publication, or public use of a product similar to or embodying technology similar to the patented invention . . . give rise to a duty to investigate whether there is infringement.").

The relationship of the parties as direct competitors since 2001 and the extensive communications between the parties in 2004 makes Akamai's delay in filing suit until June 2006 particularly unreasonable. Akamai had knowledge that Limelight was a competitor capable of competing for and winning major CDN accounts since 2001. Akamai confirmed and expanded this knowledge in 2002, 2003 and during the course of the acquisition discussions in 2004. Akamai had more than sufficient information to assess whether Limelight potentially infringed, yet Akamai waited nearly five years before filing suit and affirmatively misled Limelight in the meantime. Under these circumstances, Akamai's delay was unreasonable and misleading.

### 3. Akamai's Delay Has Caused Economic And Evidentiary Prejudice To Limelight.

For the reasons discussed above in connection with equitable estoppel, Akamai's delay in filing suit has caused substantial economic prejudice to Limelight.

Limelight has also suffered evidentiary prejudice from Akamai's delay. Akamai's key witnesses cannot recall many facts about the patent prosecution, prior art, or their own communications during the relevant times periods. For example, Dr. Leighton and Mr. Judson testified that they cannot recall when they first learned of material prior art up to and during prosecution of the '703 Patent. FF163. Mr. Judson's memory has faded regarding the prior art search conducted as a prerequisite to filing the Petition to Make Special, and numerous other topics. FF164-65. In addition, neither Akamai nor Mr. Judson can locate any documents regarding the search referenced in the Petition to Make Special. FF166.

These examples of Applicants' lack of memory and documents are just the tip of the iceberg (FF168) and are particularly significant because the events in question are at the center of Limelight's inequitable conduct defense. Such losses due to the passage of time support a finding of laches. See, e.g., A.C. Aukerman Co., 960 F.2d at 1033 (evidentiary prejudice exists when a defendant is unable to present a complete defense because of the unavailability of records, the death of a witness, or the unreliability of memories of long past events, undermining the court's ability to judge the facts); Raber, 1994 WL 374542, at *4 (evidentiary prejudice included lost documentation that could properly establish a conception date for either party).

### 4.    Akamai's Delay Is Not Excused By Its Waiting Until Limelight Grew Into A Larger Competitor Or Until The Speedera Litigation Ended.

Faced with an unreasonable delay in filing suit, Akamai tries to excuse its conduct by arguing that it was entitled to wait until Limelight got bigger, and to wait more than a year after it finished litigation against another CDN defendant, Speedera. Akamai is wrong on both counts.

"[A] patentee may [not] intentionally lie silently in wait watching damages escalate, Dwight & Lloyd Sintering Co. v. Greenawalt, 27 F.2d 823, 827 (2d Cir. 1928), particularly where an infringer, if he had had notice, could have switched to a non-infringing product. Rome Grader & Mach. v. J.D. Adams Mfg. Co., 135 F.2d 617, 619 (7th Cir. 1943)." A.C. Aukerman, 960 F.2d at 1033. Thus, Akamai's excuse of Limelight being too small is legally insufficient. Moreover, that excuse is not borne out by the facts. As discussed above (see pp. 34-35), Akamai's own documents show that it already considered Limelight to be a competitor for substantial customers in 2001, and a major CDN competitor by 2004. Years before this lawsuit was filed, Akamai recognized that Limelight was winning business and market share sufficient to warrant competitive analysis and business attention. It should not now be heard to say that Limelight was not big enough to sue in a timely manner.

Akamai's other attempted excuse also fails on both the law and the facts. A plaintiff's involvement in other litigation does not automatically excuse it for unreasonably delaying a lawsuit against a potential defendant. Baker Mfg. Co. v. Whitewater Mfg. Co., 430 F.2d 1008, 1014-15 (7th Cir. 1970) (plaintiff's argument that its involvement in two other patent cases excused its delay in filing suit is "without merit"). Akamai has offered no evidence why it could not have filed suit against Limelight while the Speedera case was pending. And there is no reason Akamai could not at least have put Limelight on notice during that time, or some time well before June 2006. Akamai's after-the-fact excuse is also inconsistent with (1) the timing of the Speedera lawsuit, which ended more than a year before Akamai filed suit against Limelight, (2) Akamai's extensive acquisition talks with Limelight in 2004, during which Akamai could easily have put Limelight on notice but chose not to, and (3) Akamai's sincere congratulations

and well wishes for Limelight's business in October 2004, which Akamai would not have stated if it were delaying a suit against Limelight because it was too busy with Speedera.

### C.    Akamai's Claim Is Barred By Unclean Hands.

A party seeking equitable relief must come into court with clean hands. Patents procured by unclean hands may be rendered unenforceable in the discretion of the court. Keystone Driller Co. v. Gen. Excavator Co., 290 U.S. 240, 244 (1933); Aptix Corp. v. Quickturn Design Sys., Inc., 269 F.3d 1369, 1377 (Fed. Cir. 2001).  Where lawsuits concern public interests as well as the private interests of litigants (such as patent cases), the equitable doctrine of unclean hands assumes significant proportions.  Precision Inst. Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 815-16 (1945) (internal quotations and citations omitted).

For the reasons discussed above regarding inequitable conduct, equitable estoppel and laches, Akamai has repeatedly acted with unclean hands.  It failed to candidly prosecute the '703 Patent before the PTO.  It also misled Limelight regarding enforcement of the '703 Patent right up until the day Akamai filed suit—all the while watching Limelight invest in and expand its CDN business and commit itself to contracts around the world.  These are the very types of wrongful actions that bar relief under the doctrine of unclean hands.  See, e.g., Keystone Driller, 290 U.S. at 246 (fraudulent conduct in suppressing evidence of prior public use precluded relief under doctrine of unclean hands).  Akamai's claim should be barred for all of these reasons.

## IV.    CONCLUSION.

For the foregoing reasons, Limelight respectfully requests that the Court find the claims of the '703 Patent unenforceable based on inequitable conduct, equitable estoppel, laches and unclean hands and therefore enter judgment in favor of Limelight.

Dated:  December 9, 2008

Respectfully submitted,

LIMELIGHT NETWORKS, INC.


/s/ Robert G. Krupka
Robert G. Krupka (pro hac vice)
Alexander F. MacKinnon (pro hac vice)
Kirkland & Ellis LLP
777 South Figueroa Street
Los Angeles, California 90017
Telephone:  (213) 680-8400
Facsimile:  (213) 680-8500

Daniel K. Hampton (BBO #634195)
Holland & Knight LLP
10 St. James Avenue, 11th Floor
Boston, MA, 02116
Telephone:  (617) 523-2700
Facsimile:  (617) 523-6850

Attorneys for Defendant
LIMELIGHT NETWORKS, INC.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document as filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 9, 2008, via first class mail.

/s/ Robert G. Krupka
Robert G. Krupka